UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ENGENIUM SOLUTIONS, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-10-4412 |
| | § | |
| SYMPHONIC TECHNOLOGIES, INC., | § | |
| et al., | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

Pending before the Court are the following Motions:

1) Plaintiff Engenium Solutions, Inc.'s ("Plaintiff" or "Engenium") Motion to Strike Defendants' Expert Andrew Wright ("Motion to Strike Wright") (Doc. No. 147);

2) Plaintiff's Motion to Strike Expert Dave Faiola ("Motion to Strike Faiola") (Doc. No. 148);

3) Defendants Symphonic Technologies, Inc.'s ("Symphonic") and Steve Carr's ("Carr") (collectively "Defendants") Motion to Exclude Testimony and Expert Report of Krishna Muppavarapu ("Motion to Exclude Muppavarapu") (Doc. No. 136);

4) Defendants' Motion to Exclude the Opinions and Conclusions of Chris W. Johnson ("Motion to Exclude Johnson")  (Doc. No. 137);

5) Plaintiff's Partial Motion for Summary Judgment on Copyright Liability and Request for Permanent Injunction ("Partial Motion for Summary Judgment") (Doc. No. 134); and

6) Defendants' Motion for Summary Judgment.  (Doc. No. 138.)

After considering the Motions, all responses thereto, and the applicable law, the Court

finds that:

1) Plaintiff's Motion to Strike Wright (Doc. No. 147) must be **GRANTED**;

2) Plaintiff's Motion to Strike Faiola (Doc. No. 148) must be **GRANTED**;

3) Defendants' Motion to Exclude Muppavarapu (Doc. No. 136) must be **DENIED**;

4) Defendants' Motion to Exclude Johnson (Doc. No. 137) must be **DENIED**;

5) Plaintiff's Partial Motion for Summary Judgment (Doc. No. 134) must be **GRANTED**; and

6) Defendants' Motion for Summary Judgment (Doc. No. 138) must be **GRANTED IN PART AND DENIED IN PART**.

## I. BACKGROUND

In 2006, Kartik Shetty ("Shetty") and Carr partnered to develop scheduling software that would work in conjunction with SAP, a family of scheduling and maintenance software programs used worldwide by many businesses. (Doc. No. 138-5, Carr Decl. ¶¶ 4–5; Doc. No. 123, Expert Report of Krishna Muppavarapu, at 6.) They envisioned that Carr would be responsible for the business and design aspects, and Shetty would develop the actual code for the software. (Doc. No. 138-5, Carr Decl. ¶ 4; Doc. No. 134, Ex. I, Shetty Dep. 83:19–21, 89:3–8.) In October 2006, they formed Engenium. (Doc. No. 138-5, Carr Decl. ¶ 5.) During the time that Carr worked for Engenium, *Engenium Scheduling Workbench* ("*Scheduling Workbench*") was developed and sold. (Doc. No. 2, Am. Compl. ¶¶ 9–11; Doc. No. 48, Answer ¶¶ 9–11.)

*Scheduling Workbench* is a customized scheduling and maintenance tool that is compatible with SAP but also provides additional features that SAP software does not offer. (Muppavarapu Report, at 6–9; Doc. No. 134, Ex. F, Expert Report of Gary Grant, 6–8.) Because SAP is utilized by a wide range of industries, SAP software may not meet some of the needs of a particular company. (Muppavarapu Report, at 7; Grant Report, 4.) Third-party developers like Engenium identify industry- or customer-specific needs that SAP's software does not address, and develop SAP-compatible software to meet those needs. (Muppavarapu Report, at 7.)

*Scheduling Workbench* enhances an organization's ability to perform maintenance efficiently.  (Muppavarapu Report, at 8–9; Grant Report, 7–8.)  SAP has its own software, SAP Plant Maintenance ("SAP PM"), that also schedules personnel to perform maintenance in a streamlined and coordinated fashion.  (Muppavarapu Report, at 8; Grant Report, 7.)  However, Engenium's software provides several features that SAP PM does not, including: (1) a single screen that presents all of the necessary data for planning and scheduling; (2) numerous Key Performance Indicator ("KPI") reports, which allow for better measurement and management of plant processes; (3) importation of data out of *Scheduling Workbench* and into Microsoft Excel, which allows the schedule to be displayed in a Gantt chart, a useful visual tool for scheduling work; (4) importation of data out of *Scheduling Workbench* and into Microsoft Project, a more user-friendly program, where data can be manipulated and then imported back into *Scheduling Workbench*; and (5) a customized material availability check feature that includes additional options not present in SAP PM's material availability check.  (Muppavarapu Report, at 19, 23, 26; Grant Report, 6–8.)

In order to be able to develop this customized, SAP-compatible software, Engenium executed a Development License Agreement ("DLA") with SAP AG, the manufacturer of the SAP family of products.  (Doc. No. 163-1, DLA; Muppavarapu Report, at 6.)  The DLA grants Engenium a license to use SAP's software.  (DLA, at 1.)  The DLA recognizes that the licensee such as Engenium may develop several types of SAP-compatible programs, including add-ons, enhancements, and modifications.  (*Id.* ¶¶ 1.1, 1.7, 1.12, 2.3.2, 2.3.3.)  The DLA defines these licensee programs as follows:

1.1  '<u>Add-on</u>' means any developments utilizing the SAP development environment, SAP published APIs and/or libraries to create a new object that adds new and independent functionality, and branches off from the published SAP APIs and/or user exits (e.g. new functional components for

3

> business processes not covered by the Software constitute Add-ons; however, standalone interface code from SAP software to non software is not considered an Add-on).
>
> . . .
>
> 1.7 'Enhancement' means a development utilizing the SAP development environment, SAP published APIs and/or libraries to create a new object supporting an existing business scenario that customizes, enhances or changes in any other way existing SAP functionality (e.g. the creation of new APIs, alternative user interfaces, additional business content within existing functionality, and/or the extension of data structures or metadata all constitute enhancements.) [*sic*]
>
> . . .
>
> 1.12 'Modification' means an alteration to the Software (e.g. a change made to the source code, metadata, etc ) [*sic*] in which original SAP content is replaced with the modified content.). [*sic*]

(*Id.* ¶¶ 1.1, 1.7, 1.12.)  The DLA provides that, "ownership of Modifications and Enhancements, and any Intellectual Property Rights embodied therein, shall vest with SAP."  (*Id.* ¶ 2.3.2.1.)  It specifically states that Engenium "irrevocably assigns to SAP all Licensee's rights, title and interest ('Assigned Intellectual Property Rights') in and to the Modifications and Enhancements, including the right to register or file proprietary rights based on the Modifications and Enhancements."  (*Id.*)  In contrast, the DLA provides that, "[t]he ownership of Add-ons shall vest in Licensee, or the end customer if so provided in the agreement between Licensee and end customer."  (*Id.* ¶ 2.3.3.)

Defendants contend that numerous features of *Scheduling Workbench* are enhancements or modifications within the meaning of the DLA.  (Doc. No. 163, Defs.' Reply to Pl.'s Resp. to Defs.' Mot. for Summ. J. ("Defs.' Reply"), at 3–5.)   Plaintiff contends that *Scheduling Workbench* is actually an Add-on, and provides documentation from SAP showing that SAP certified *Scheduling Workbench* as a SAP Add-on.  (Doc. No. 173, Pl.'s Surreply to Defs.' Reply to Pl.'s Resp. to Defs.' Mot. for Summ. J. ("Pl.'s Surreply"), 3–5; Doc. No. 173-2, SAP Integration Certificate; Doc. No. 173-3, SAP Add-on Test Report for Interface Certification.)

Defendants also contend that several other aspects of *Scheduling Workbench* which may be Add-ons are actually owned by ConocoPhillips, a customer of Engenium's. (Doc. No. 138, Defs.' Mot. for Summ. J., at 8–10; Defs.' Reply, at 5–7.)  In 2008, ConocoPhillips and Engenium executed a Master Software License, Maintenance and Service Agreement ("MLA") granting ConocoPhillips a license to use *Scheduling Workbench*. (Doc. No. 158, MLA; Doc. No. 138-5, Carr Decl. ¶¶ 10–11.)  The MLA provides as follows:

> 18.2 All copyrights, patents, trade secrets, or other intellectual property rights associated with any ideas, concepts, techniques, inventions, processes, or works of authorship developed or created by Licensor during the course of performing work for Licensee (collectively the 'Work Product') shall belong exclusively to Licensee and shall, to the extent possible, be considered a work made for hire for Licensee within the meaning of Title 17 of the United States Code.  To the extent the Work Product may not be considered work made for hire for Licensee, Licensor agrees to assign, and hereby assigns at the time of creation of the Work Product, without any requirement of further consideration, any right, title, or interest Licensor may have in such Work Product.

(MLA ¶ 18.2.)  Defendants present email communications and invoices indicating that at least some of the features of *Scheduling Workbench* were added per ConocoPhillips' request. (Doc. No. 163-2, August 4, 2009 Email from Carr to Conoco-Phillips; Doc. No. 163-3, March 23, 2012 ConocoPhillips Service Order.)

Engenium points out that the MLA specifically provides that ConocoPhillips will possess only a license to use *Scheduling Workbench* and any subsequent updates, versions or releases of *Scheduling Workbench*. (Doc. No. 176, Pl.'s Second Surreply to Defs.' Reply to Pl.'s Resp. to Defs.' Mot. for Summ. J. ("Pl.'s Second Surreply"), at 3–5.)  They rely on a provision of Schedule A of the MLA, which provides as follows:

> Licensed Programs licensed to Licensee shall be listed herein and defined as a machine executable version of such Licensed Programs and shall be deemed to include (i) the information and data contained in the relevant media, (ii) the reference manual, the programming tutorial and the installation guide (to be

included where applicable) and *any subsequent Updates, Versions or Releases of such materials provided to Licensee by Licensor* and (iii) any other platform specific proprietary and confidential materials that Licensor may provide to Licensee in connection herewith. The license granted shall not extend beyond or include any material or Licensed Programs other than the material and Licensed Programs expressly and specifically set forth herein.

(MLA, Ex. A, at 1 (emphasis added).)  "Updates" are defined as "corrections or improvements to the Licensed Program which result from notifications submitted by Licensee or internally initiated by Licensor."  (*Id.* ¶ 15.4.)  "Versions" are defined as "significant functional and/or technical Improvements requiring redesign and redevelopment of a major component of the Licensed Program into a new technology environment."  (*Id.*)  "Releases" are defined as "functional refinements and/or technical improvements to the Licensed Program within the technology environment in which the Licensed Program is functioning."  (*Id.*)  Plaintiff contends that the changes made to *Scheduling Workbench* are updates, versions, or releases.  (Pl.'s Second Surreply, at 3–5.)

Over time, Shetty and Carr's relationship became strained, and on August 18, 2010, Carr resigned from Engenium.  (Doc. No. 138-5, Carr Decl. ¶¶ 8, 14; Doc. No. 134, Pl.'s Partial Mot. for Summ. J. ¶ 19.)  On July 26, 2010, just prior to resigning, Carr removed $64,687.50 from Engenium's bank account.  (Doc. No. 150-10, Engenium's Checking Account History, at 1; Doc. No. 138-5, Carr Decl. ¶ 15.)  The amount Carr removed was precisely half of a support fee paid by ConocoPhillips that same day.  (Doc. No. 150, Pl.'s Br. In Support of Its Resp. and Opposition to Defs.' Mot. for Summ. J. ("Pl.'s Resp."), at 21; Engenium's Checking Account History, at 1.)  Carr contends that, for over a year, he provided support and training to ConocoPhillips without compensation, and this amount constituted his rightful share of the proceeds.  (Doc. No. 138-5, Carr Decl. ¶ 15.)  Engenium claims that the $129,375.00 payment made by ConocoPhillips on July 26, 2010 was actually support fees for the upcoming year.

(Pl.'s Resp., at 21.)   Engenium attaches two invoices, one dated July 19, 2009, for "annual support" for *Scheduling Workbench* from June 1, 2009 through May 31, 2010, and another dated May 10, 2010, for an "Annual Service agreement."   (Doc. No. 150-12, July 19, 2009 Invoice; Doc. No. 150-13, May 10, 2010 Invoice.)

Before his resignation, on August 10, 2010, Carr filed a Certificate of Formation for Symphonic.   (Doc. No. 150-11, Certificate of Formation.)   Symphonic also developed SAP-compatible scheduling software, *Harmonix*.   (Doc. No. 138-5, Carr Decl. ¶¶ 18; Doc. No. 134, Pl.'s Partial Mot. for Summ. J. ¶ 21; Doc. No. 134, Ex. H, *Harmonix* User Guide.)   Almost immediately after Carr resigned from Engenium, he negotiated a contract between Symphonic and Kraton Ploymers, a company he was previously negotiating with on behalf of Engenium. (Doc. No. 150, Pl.'s Resp., at 20; Doc. No. 150-8, Aug. 10, 2010 – Aug. 17, 2010 Emails between Carr and representative of Kraton Polymers (signature line indicating that Carr was emailing in his capacity as a representative of Engenium); Doc. No. 150-9, Aug. 20, 2010 Emails between Carr and representative of Kraton Polymers (email address indicating Carr was negotiating on behalf of Symphonic).)

Carr and Iain Ross, a SAP consultant who Carr had previously hired to perform work on *Scheduling Workbench*, continued to service ConocoPhillips on Engenium's behalf for at least a brief period of time after Carr's resignation.   (Doc. No. 138-3, Ross Decl. ¶ 43; Doc. No. 138-5, Carr Decl. ¶ 16; Doc. No. 156-4, Carr Decl. ¶¶ 6–7.)   This work was performed at Shetty's request.   (Doc. No. 156-4, Carr Decl. ¶ 7; Doc. No. 156-7, Sept. 10, 2010 Email from Shetty.) As part of his support work, both before and after Carr's resignation from Engenium, Ross maintained a copy of *Scheduling Workbench* on his personal server, DM0.   (Doc. No. 156-4, Carr Decl. ¶¶ 6–7; Doc. No. 156-9, Feb. 11, 2010 Email from Shetty.)   Around August 24, 2010,

Shetty instructed Ross to delete the copy of *Scheduling Workbench* from his personal server, and perform all future Engenium support from Engenium's server, DR1.  (Doc. No. 138-3, Ross Decl., Ex. 5.)  Ross informed Shetty that removal was complete the following day.  (Doc. No. 138-3, Ross Decl. ¶ 44.)[1]  Sometime in the end of August 2010, Ross informed Shetty that he no longer wished to work for Engenium.  (*Id.* ¶ 47.)  Sometime in late August 2010, Carr offered Ross a position at Symphonic, which he accepted.  (Doc. No. 138-3, Ross Decl. ¶ 50.)  At some point in December 2010 or early 2011, Symphonic acquired the DM0 server.  (Doc. No. 156-4, Carr Decl. ¶¶ 5–6.)

Like *Scheduling Workbench*, *Harmonix* (1) presents all relevant data for planning and scheduling on a single screen; (2) comes with standard KPI reports; (3) offers the capability to import of data out of *Scheduling Workbench* and into Microsoft Excel; (4) offers the capability to import of data out of *Scheduling Workbench* and into Microsoft Project; and (5) includes a customized material availability check.  (Muppavarapu Report, at 19–28; Grant Report, 6–8.)  Plaintiff's expert, Krishna Muppavarapu, identified a number of similarities in the source code of *Harmonix* and *Scheduling Workbench*, including: (1) code for a *Scheduling Workbench* program that schedules work orders and operations and a *Harmonix* program that performs the same functions is virtually identical; (2) there are numerous shared non-functional characteristics, such as identical line breaks, spacing, indentation, identical loading language and identical timing of loading message, and data beginning to populate into a Microsoft Excel spreadsheet at the same arbitrary line number; (3) some of *Harmonix*'s obsolete code[2] is identical to active code in *Scheduling Workbench*; (4) *Harmonix*'s customized material availability feature contains active

---

[1] However, Carr's declaration provides that Ross deleted *Scheduling Workbench* from his server on August 30, 2010.  (Doc. No. 156-4, Carr Decl. ¶ 7.)

[2] Obsolete code, sometimes referred to as commented out code, is code that does not affect the function of a program, but has not been deleted from the source code.  (Muppavarapu Report, at 21.)  Code is "commented out" by adding an asterisk at the first position of the line, which tells SAP to ignore the code that follows.  (*Id.*)

code for four of the five buttons found in *Scheduling Workbench*'s material availability check, and *Harmonix* contains obsolete code for the fifth button in *Scheduling Workbench*; (5) *Harmonix*'s material availability check contains identical obsolete code as *Scheduling Workbench*'s material availability check; (6) *Harmonix* and *Scheduling Workbench* contain the same variables,[3] and an older version of *Harmonix* defines thirteen variables that are never referenced in *Harmonix*'s code, but are referenced in *Scheduling Workbench*'s code; and (7) identical typographical errors in identical locations in both *Harmonix* and *Scheduling Workbench*'s source code. (Muppavarapu Report, at 16–23, 26–36; Muppavarapu Report, at Ex. G; Muppavarapu Report, at Ex. I; Muppavarapu Report, at Ex. M.)[4]

Defendants, relying on expert reports of Andrew Wright and Dave Faiola, point out that software programs like *Harmonix* and *Scheduling Workbench* will often have similar functionality and code because they are designed to be compatible with SAP and are, at least in part, derived from SAP-supplied code. (Defs.' Mot. for Summ. J., at 12–13; Doc. No. 138-6, Expert Report of W. Andrew Wright ¶ 6; Doc. No. 138-7, Expert Report of Dave Faiola ¶¶ 15, 23, 26, 33, 35.) They also argue that the evidence presented by Plaintiff cannot show substantial similarity between *Harmonix* and *Scheduling Workbench* because Muppuvarapu considers less than 5% of the code of *Scheduling Workbench* and 1% of the code of *Harmonix*. (Defs.' Mot. for Summ. J., at 16–17; Doc. No. 138-3, Ross Decl. ¶¶ 3–4.) Defendants' experts also point to several functional and code-level differences between the programs, including: (1) *Harmonix* can run certain reports that *Scheduling Workbench* cannot; (2) *Harmonix* has a feature that

---

[3] A variable is a way to reference defined, stored values. (Muppavarapu Report, at 32.)
[4] Muppavarapu also identifies 1,585 references to Engenium's unique, SAP-issued namespace on *Harmonix*'s system. (Muppavarapu Report, at 12–14.) Defendants argue vigorously that these references, and the evidence of transfer requests sent from DM0 to Engenium's server, are not evidence of impermissible copying because Ross was permitted to make such a copy as part of his support obligations to ConocoPhillips. (Defs.' Mot. for Summ. J., at 3–10.) The Court's opinion does not rely on the presence of Engenium's namespace on DM0.

allows automatic "leveling" (efficient allocation) of work orders against available craftsmen, whereas *Scheduling Workbench* does not; and (3) *Harmonix* and *Scheduling Workbench* have different selection screens for entering data.  (Doc. No. 138-6, Wright Report ¶¶ 9–14; Doc. No. 138-7, Faiola Report ¶¶ 24–32.)

Plaintiff now moves for partial summary judgment on its copyright infringement claims, arguing that Defendants infringed on, and continue to infringe on, Plaintiff's exclusive right to reproduce under 17 U.S.C. § 106(1), Plaintiff's exclusive right to prepare derivative works under 17 U.S.C. § 106(2), and Plaintiff's exclusive right to distribute copies under 17 U.S.C. § 106(3).  (Pl.'s Partial Mot. for Summ. J., at 10–27.)  Plaintiff seeks an injunction and actual damages arising from Defendants' alleged infringement.  (*Id.* at 27–30.)  Defendants also move for summary judgment on Plaintiff's copyright infringement claims, arguing that Plaintiff does not own the allegedly infringed code and, in any event, *Harmonix* and *Scheduling Workbench* are not substantially similar.  (Defs.' Mot for Summ. J., at 8–18.)  Additionally, Defendants move for summary judgment on Plaintiff's state law causes of action, which include unfair competition/ breach of fiduciary duty, misappropriation of trade secrets, conversion, tortious interference with contract.  (*Id.* at 18–30.)  Both parties also filed several Motions to Exclude and Motions to Strike each other's experts.  (Mot. to Strike Wright; Mot. to Strike Faiola; Mot. to Exclude Muppavarapu; Mot. to Exclude Johnson.)

The Court turns to the Motions to Exclude and Motions to Strike first.  The Court then considers both parties' Motions for Summary Judgment on copyright infringement.  Finally, the Court addresses Defendants' Motion for Summary Judgment on state law claims.

## II.      MOTIONS TO STRIKE AND MOTIONS TO EXCLUDE

### A.      Legal Standard

Federal Rule of Evidence 702 provides for the admission of expert testimony that assists the trier of fact to understand the evidence or to determine a fact in issue.  A court is charged with a "gatekeeping function" to ensure expert testimony is both reliable and relevant.  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993).  Testimony is reliable if: (1) it is based upon sufficient facts or data, (2) it is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.  Fed. R. Evid. 702.  In *Daubert,* the Supreme Court provided several nonexclusive factors to guide courts in evaluating the reliability of a methodology.  Those factors include whether the theory can be and has been tested; whether the theory has been subjected to peer review and publication; the theory's known or potential rate of error; the existence and maintenance of standards and controls; and whether the theory is generally accepted.  509 U.S. at 593–94.  The test for determining reliability is flexible and can adapt to the particular circumstances underlying the testimony at issue.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150–51 (1999).

Further, the expert witness must be qualified "by knowledge, skill, experience, training, or education . . . ."  Fed. R. Evid. 702.  A court must exclude an expert witness "if it finds that the witness is not qualified to testify in a particular field or on a given subject."  *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999).  However, "Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue.  Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility."  *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009) (citing *Daubert*, 509 U.S. at 596).

The party seeking to rely on expert testimony bears the burden of establishing, by a preponderance of the evidence, that all requirements have been met.  *Daubert*, 509 U.S. at 593, n.10; *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998).

### B.      Motion to Strike Wright

Plaintiff argues that (1) Wright is not qualified, (2) his opinion is not reliable, and (3) his opinion is not relevant.  Plaintiff also argues that Wright's opinion should be excluded because it fails to comply with the requirements of Fed. R. Civ. P. 26(a)(2)(B).  (*See generally* Doc. No. 147, Mot. to Strike Wright.)

### 1.      Qualifications

Wright has worked as a SAP consultant, analyst and programmer since 1994, with a focus on plant maintenance and scheduling services.  (Wright Report ¶ 2.)  He was hired as an expert to review the functional characteristics and screen appearance of Engenium's and Symphonic's products.  (*Id.* ¶ 1.)  Plaintiff argues that Wright is not qualified because he does not have an engineering background.  (Mot. to Strike Wright, at 3.)  At the hearing held on the Motions to Strike and Motions to Exlude, Plaintiff also argued that Wright is unqualified because, while he has SAP experience, he has no experience comparing customized SAP software.

The mere fact that Wright does not have engineering training does not mandate his exclusion.  *See* Fed. R. Evid. 702 advisory committee's note (2000 Amendment) ("Nothing in this amendment is intended to suggest that experience alone—or experience in conjunction with other knowledge, skill, training or education—may not provide sufficient foundation for expert testimony.  To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience."); *see also S. Cement Co.*, *Div. of Martin-Marietta Corp. v. Sproul*, 378 F.2d 48, 49 (5th Cir. 1967) ("As a general rule, (a) person may become qualified as an expert by practical experience.  Professional education is not a prerequisite.").  Furthermore, that Wright does not purport to have a background in comparing customized SAP software also does not require exclusion.  *See Wellogix, Inc. v. Accenture, LLP*, 788 F. Supp. 2d 523, 537 (S.D.

Tex. 2011) (rejecting qualification challenge to expert in copyright case involving SAP software where he had "broad experience at the general level of computer design and programming in various programming languages and computer systems, and has developed experience with [the SAP programming language] specifically"); *see also Huss v. Gayden*, 571 F.3d at 452 ("Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility.")  Wright has over eighteen years of experience with SAP, with a focus on SAP PM, the very program *Harmonix* and *Workbench Scheduling* customize.  (Doc. No. 138-6, Wright Report ¶ 2.)  The Court is satisfied that Wright's experience qualifies him to be an expert.

2. <u>Reliability</u>

Wright conducted his analysis by dividing *Harmonix* and *Scheduling Workbench* into their three main functions: scheduling and backlog management, scheduling and backlog report, and schedule compliance.  (Wright Report ¶ 8.)  He then compared the components within each of these primary functions.  (*Id.*)  He includes a chart that explains the functionality and appearance differences between the two programs.  (*Id.*, Ex. A.)  Plaintiff argues that Wright's opinion is not reliable because he does not explain what data he used to reach his conclusions, which makes his conclusions unverifiable.  (Mot. to Strike Wright, at 3–6.)  Defendants respond that Wright conducted his comparison of the functional aspects of *Harmonix* and *Scheduling Workbench* in the only reliable manner conceivable: a side-by-side comparison of the programs. (Doc. No. 166, Resp. to Pl.'s Mot. to Strike Wright, at 2–3.)

The Court must agree with Plaintiff that Defendants have not met their burden to show that Wright employed a reliable methodology.  The Court acknowledges that the *Daubert* factors may be ill-suited to assessing the reliability of the methodology employed by an expert comparing the features of two pieces of software.  *See Kumho Tire*, 526 U.S. at 150–51

(recognizing that the "factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony").  However, Defendants must provide some evidence of reliability of the method employed by their expert.  The report does not indicate how Wright decided which components to compare, or how much time he spent comparing them.  Indeed, the report does not explain how, exactly, Wright compared the features of the programs at all.  (*See* Wright Report ¶ 8.)  Furthermore, Wright does not explain on what basis he concluded when features in the two programs performed different functions; there are no supporting screenshots or reports produced by the two competing programs to support his conclusions.  The Court has simply not been presented with any evidence of the reliability of Wright's methodology.  Accordingly, the Court must exclude Wright's report and testimony.

For the reasons stated above, Plaintiff's Motion to Strike Wright is **GRANTED**.  The Court need not reach the remainder of Plaintiff's challenges to Wright's report.

### C.      Motion to Strike Faiola

Plaintiff argues that (1) Faiola is not qualified, (2) his opinion is not reliable, and (3) his opinion is not relevant.  Plaintiff also argues that Faiola's opinion should be excluded because it fails to comply with the requirements of Fed. R. Civ. P. 26(a)(2)(B).  (*See generally* Doc. No. 148, Mot. to Strike Faiola.)

### 1.      Qualifications

Dave Faiola has worked as a SAP consultant, analyst and programmer since 1995.  (Faiola Report ¶ 2.)  He primarily provides SAP consulting and programming services.  (*Id.*)  Based on his experience, he is familiar with the standards SAP supplies to licensees to use in custom solutions like the scheduling tools at issue here.  (*Id.* ¶ 3.)  He was hired to compare the source codes of Engenium's *Scheduling Workbench* and Symphonic's *Harmonix*.  (*Id.* ¶ 1.)

14

Plaintiff argues, briefly, that Faiola is not qualified to render some of the opinions in his report because they are legal conclusions.  (Mot. to Strike Faiola, at 3.)  The Court disregards those portions of Faiola's report that offer legal conclusions as to whether *Scheduling Workbench* and *Harmonix* are "substantially similar."  (*See, e.g.*, Faiola Report  ¶ 35.)  Plaintiff does not challenge Faiola's qualifications to provide expert opinion about the source codes of *Scheduling Workbench* and *Harmonix*.  Furthermore, the Court does not doubt that Faiola's extensive experience as a SAP consultant, analyst and programmer qualifies him to testify about similarities and differences in the source code of SAP customization software.

2.   Reliability

Faiola inspected Harmonix and Scheduling Workbench for approximately nine hours in connection with his duties as an expert.  (Faiola Report  ¶ 4.)  The methodology he employed was to compare the current and earliest versions of Symphonic's software, ascertain what he considered to be the "original code,"[5] and compare that "original code" against Engenium's corresponding component.  (*Id.* ¶ 8.)  His analysis focused on source code for Scheduling, Compliancy and Reporting and for two Function Modules.  (*Id.* ¶ 7.)  Plaintiff argues that Faiola's report is not reliable because (1) Faiola has not explained the methodology or procedures utilized, making his conclusions unverifiable, and (2) he does not attach any exhibits showing portions of *Scheduling Workbench*, *Harmonix*, or SAP code analyzed.  (Mot. to Strike Faiola, at 3–5.)  Defendants respond that the methodology employed by Faiola is a side-by-side comparison, and is, in fact, the same methodology Plaintiff's expert used.  (Doc. No. 167, Defs.' Resp. to Mot. to Strike Faiola, at 2–3.)  They further note that challenges to the fact that Faiola used the oldest version of Symphonic go to credibility, not admissibility, of the expert.  (*Id.* at 3.)

---

[5] Unfortunately, Faiola's report does not explain how the "original code" is different from the earliest version of Symphonic's software, or how exactly Faiola derived this so-called "original code."  (*See* Faiola Report ¶ 8.)

For the same reasons the Court excludes Wright, the Court must also exclude Faiola. Defendants again do no more than merely assert that Faiola conducted a side-by-side comparison of Symphonic's and Engenium's software.  Manually comparing code side-by-side is not an inherently unreliable methodology.  *See Computer Assocs. Int'l v. Quest Software, Inc.*, 333 F. Supp. 2d 688, 694 (N.D. Ill. 2004) (recognizing that "[t]here does not appear to be any perfect way to compare millions of lines of source codes," and finding reliable expert's method when expert "manually compared the source codes, directing his attention to the areas of the program in which [plaintiff] (and its attorneys) believed copying would be found").  However, bare assertions of a side-by-side comparison do not convince this Court that Faiola's methodology is reliable.  Indeed, as noted *supra*, Faiola's report is far from clear as to his methodology; the Court cannot be sure whether Faiola is comparing *Scheduling Workbench*'s code to the earliest *Harmonix*'s code found on Symphonic's server or to a code Faiola derived from numerous versions of *Harmonix*'s code.  (*See* Faiola Report ¶ 8.)  Nor does Faiola provide screenshots or excerpts of *Scheduling Workbench*, *Harmonix*, or SAP code that reveal the basis for his conclusions.  (*See generally* Faiola Report.)  Without some evidence that confirms the reliability of Faiola's methodology, the Court must exclude his report and testimony.

For the reasons stated above, Plaintiff's Motion to Strike Faiola is **GRANTED**.  The Court need not reach the remainder of Plaintiff's challenges to Faiola's report.

### D.    Motion to Exclude Muppavarapu

Krishna Muppavarapu has over 14 years of experience in SAP Advanced Business Applications Programming ("ABAP").  (Muppavarapu Report, at 3.)   He attended ABAP training and took a certification exam and was certified in ABAP.  (*Id.*)  He has developed several hundred new programs and has also modified several hundred existing programs.  (*Id.* at 4.)

Muppavarapu reviewed the user manuals of *Harmonix* and *Scheduling Workbench*, and received a demonstration of *Scheduling Workbench* from Shetty. (*Id.*) He then spent three days inspecting *Harmonix*'s code. (*Id.* at 10–11.) Muppavarapu took screenshots throughout his inspection, and then spent several days comparing screenshots of original and current versions of *Harmonix* to the real code of *Workbench Solutions*. (*Id.*) Defendants argue that Muppavarapu's report must be excluded for lack of basis. (Mot. to Exclude Muppavarapu, at 4–5.) Specifically, they argue that the *Harmonix* code analyzed in Muppavarapu's report amounts to only 1% of the total *Harmonix* code and 5% of *Scheduling Workbench*'s code, an insufficient factual basis from which to extrapolate copying. (*Id.*)[6] They also challenge certain aspects of the report as mischaracterizations, arguing that some of the similarities identified by Muppavarapu are SAP standards. (*Id.* at 5–6.)[7]

In *Viterbo v. Dow Chemical Co.*, the Fifth Circuit explained that:

> As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration. In some cases, however, the source upon which an expert's opinion relies is of such little weight that the jury should not be permitted to receive that opinion. Expert opinion testimony falls into this category when that testimony would not actually assist the jury in arriving at an intelligent and sound verdict. If an opinion is fundamentally unsupported, then it offers no expert assistance to the jury.

826 F.2d 420, 422 (5th Cir. 1987) (citations omitted). *See also Moss v. Ole S. Real Estate, Inc.*, 933 F.2d 1300, 1307 (5th Cir. 1991). "As the Court in *Daubert* makes clear, . . . the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system:

---

[6] Defendants obtain these numbers from a declaration by Ross. (Doc. No. 136-1, Ross Decl. ¶¶ 4 –5.) Plaintiff seeks to strike this declaration, and numerous others by Ross, as undisclosed and impermissible expert testimony. (*See, e.g.*, Doc. No. 142, Pl.'s Objections to and Mot. to Strike Iain Ross' Decl.; Doc. No. 146, Pl.'s Objections to Defs.' Evidence in Support of Defs.' Mot. for Summ. J., at 2–6.) The Court addresses the admissibility of Ross' declarations *infra* Part II.D n.8.

[7] Defendants also argue the report is inadmissible because it has not been signed by Muppavarapu. (Mot. to Exclude Muppavarapu, at 2.) Although the Court itself received an unsigned courtesy copy, Plaintiff electronically filed a signed copy of Muppavarapu's report on December 18, 2012. (*See* Doc. No. 123.) Thus, Defendants' argument is moot.

'Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'"  *United States v. 14.38 Acres of Land, More or Less Situated in Leflore County, State of Miss.*, 80 F.3d 1074, 1078 (5th Cir. 1996) (quoting *Daubert,* 509 U.S. at 596).

Defendants' argument that Muppavarapu analyzes only 1% of *Harmonix* code goes to the weight of the report, not its admissibility.  This is not a case where the expert bases his opinions on facts that are of so little weight that his opinion should not be admitted at all.  While 1% of *Harmonix*'s code is not a large amount, another district court has recognized that "[t]here does not appear to be any perfect way to compare millions of lines of source codes" and allowed focusing on those parts where copying is likely.  *Computer Assocs.*, 333 F. Supp. 2d at 694. Courts that strike experts for lack of factual basis typically involve an expert who cannot point to *any* data supporting his opinion.  *See, e.g.*, *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904– 05 (7th Cir. 2007); *cf. Rudd v. Gen. Motors Corp.*, 127 F. Supp. 2d 1330, 1341 (M.D. Ala. 2001) (admitting expert even though he had no direct evidence of his conclusion, and his opinion was based only on circumstantial evidence).  Defendants' contentions that Muppavarapu does not acknowledge that certain similarities identified in his report exist because SAP, not Engenium, owns portions of the code in both *Harmonix* and *Scheduling Workbench* also go to weight and credibility.[8]

---

[8] Furthermore, Plaintiff is correct that if Defendants wished to use declarations from Ross to impeach Plaintiff's expert's analysis and conclusions, Ross should have been disclosed as an expert.  *See Musser v. Gentiva Health Servs.*, 356 F.3d 751, 757 (7th Cir. 2004) (recognizing that "[d]isclosing a person as a witness and disclosing a person as an expert witness are two distinct acts" and excluding expert testimony of treating physicians and nurses who were listed as fact witnesses).  Indeed, the very case Defendants cite in support of admitting Ross' declaration, *Furmanite Am., Inc. v. T.D. Williamson, Inc.*, 506 F. Supp. 2d 1126 (M.D. Fla. 2007), makes clear that the challenged witness in that case had personal knowledge based on his past work on Plaintiff's computer system, "rather than being subsequently supplied with such information by counsel."  506 F. Supp. 2d at 1133.  This Court does not doubt that Ross, having worked at Engenium and Symphonic, possesses certain technical information of relevance to this case through his personal experience.  Perhaps he even has personal knowledge as to how much of an overlap exists between the code of *Harmonix* and *Scheduling Workbench*.  However, the portions of his

The Court declines to exclude Muppavarapu's opinions on the grounds raised by Defendants. Rather, the Court finds that Muppavarapu's report demonstrates compliance with the requirements of Federal Rule of Evidence 702. Accordingly, Defendants' Motion to Exclude Muppavarapu is **DENIED**.

### E.      Motion to Exclude Johnson

Chris W. Johnson is a Senior Manager at UHY Advisors FLVS, Inc. ("UHY"). (Doc. No. 121, Expert Report of Chris W. Johnson, at 2–3.) He holds a master of science in economics from Texas A&M, is an accredited valuation analyst and has prior experience valuing software. (*Id.*) He was retained by Plaintiff to quantify damages in this case. (*Id.* at 1.) In assessing damages, Johnson has assumed that Engenium owns a valid copyright on *Scheduling Workbench*, and Defendants infringed Engenium's copyright. (*Id.*) In reaching his conclusions, he interviewed Shetty and reviewed various documents that shed light the likelihood that Engenium would have developed a relationship with customers Symphonic ultimately sold products and services to. (*Id.* at 1, 6–10, Ex. B.) His damages figures are based on income Symphonic earned from sales of *Harmonix* to several companies that he concludes would have otherwise purchased *Scheduling Workbench*, plus likely maintenance contracts Engenium would have received from those companies, minus the additional cost Engenium would have had to incur to provide maintenance. (*Id.* at 6–10, Attachment A.)

Defendants seek to exclude Johnson's testimony because he assesses damages flowing from state law causes of action, over which Defendants argue this Court lacks jurisdiction. (Mot. to Exclude Johnson, at 2–4.) They also argue that Johnson's opinions should be excluded because they lack adequate factual basis. (*Id.* at 6–9.) Specifically, they argue that Johnson

---

declarations that respond to Muppavarapu's report were based on information supplied by counsel, not independent personal knowledge. Thus, testimony as to how much of each program Muppavarapu analyzed is inadmissible, as is testimony about the percent of *Scheduling Workbench*'s code that Engenium alleges Defendants copied.

improperly assumes certain facts about ownership and infringement, the length and relevance of potential maintenance agreements, and the likelihood that Symphonic's customers would have purchased *Scheduling Workbench* but for purchasing the allegedly infringing *Harmonix*.  (*Id.*)

To the extent that the Court lacks jurisdiction over any of Plaintiff's claims, Johnson's report clearly sets out those damages that flow from alleged violations of state law rather than from copyright infringement.  (*See id.* at 2.)  With regard to Defendants' argument that Johnson improperly assumes certain facts, as discussed *supra* Part II.D, challenges to the basis of an expert's opinions generally go to the weight of the evidence.  *See Viterbo*, 826 F.2d at 422; *14.38 Acres of Land*, 80 F.3d at 1078.  Furthermore, "experts are permitted to assume the underlying facts that form the basis for their opinions."  *Cromwell v. Wal-Mart Stores, Inc.*, No. 02-30035, 2002 WL 1973906, at *2 (5th Cir. Aug. 9, 2002) (citing *Daubert*, 509 U.S. at 592).  Thus, Defendants' arguments that Johnson's analysis improperly factors in a number of assumptions, such as the length of maintenance agreements and the relationship of revenue earned from maintenance agreements to the alleged infringement, all go to the weight of his opinions, not to admissibility.

The Court declines to exclude Johnson's opinions on the grounds raised by Defendants. Accordingly, Defendants' Motion to Exclude Johnson is **DENIED**.

## III.    SUMMARY JUDGMENT MOTIONS

### A.  Legal Standard

To grant summary judgment, a court must find that the pleadings and evidence show that no genuine issue of material fact exists, and that the movant is therefore entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  The party moving for summary judgment must demonstrate the absence of any genuine issue of material fact; however, the party need not negate the elements of the nonmovant's case.  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.

1994).  "If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response." *Id.*  If the moving party meets this burden, the nonmoving party must then go beyond the pleadings to find specific facts showing there is a genuine issue for trial.  *Id.*  "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law."  *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (citation omitted) (internal quotation marks omitted).

"Facts and inferences reasonably drawn from those facts should be taken in the light most favorable to the non-moving party." *Nichols v. Enterasys Networks, Inc.*, 495 F.3d 185, 188 (5th Cir. 2007).  Courts may not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  Hearsay, conclusory allegations, unsubstantiated assertions, and unsupported speculation are not competent summary judgment evidence.  Fed. R. Civ. P. 56(e)(1); *see, e.g.*, *McIntosh v. Partridge*, 540 F.3d 315, 322 (5th Cir. 2008); *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir.1996) *see also Liquid Air Corp.*, 37 F.3d at 1075 (noting that a nonmovant's burden is "not satisfied with 'some metaphysical doubt as to the material facts'") (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  However, "summary judgment is appropriate in *any* case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." *Liquid Air Corp.*, 37 F.3d at 1076 (citation omitted) (internal quotation marks omitted).  A court should not, in the absence of proof, assume that the nonmoving party could or would provide the necessary facts.  *Id.* at 1075.

## B.  Copyright Infringement

Plaintiff has moved for summary judgment on its copyright infringement claims, arguing that Engenium possesses a valid copyright on *Scheduling Workbench* and that Defendants' *Harmonix* infringed on, and continues to infringe on, that copyright.  (Pl.'s Partial Mot. for

21

Summ. J., at 10–27.)   Defendants have also moved for summary judgment on Plaintiff's copyright infringement claims, arguing that Plaintiff does not own the allegedly infringed code and, in any event, *Harmonix* and *Scheduling Workbench* are not substantially similar.   (Defs.' Mot for Summ. J., at 8–18.)   To prevail on a copyright infringement claim, a plaintiff must prove (1) ownership of a valid copyright and (2) copying by the defendant.   *Computer Mgmt. Assistance Co. v. Robert F. DeCastro, Inc.*, 220 F.3d 396, 400 (5th Cir. 2000); *Interplan Architects, Inc. v. C.L. Thomas, Inc.*, No. 08-cv-3181, 2010 WL 4366990, at *23 (S.D. Tex. Oct. 27, 2010).

### i. Ownership

Copyright ownership is shown by: (1) proof of originality and copyrightability, and (2) compliance with the applicable statutory requirements.   *Compaq Computer Corp. v. Ergonome Inc.*, 387 F.3d 403, 407–408 (5th Cir. 2004); *DeCastro*, 220 F.3d at 400.   Defendants do not argue that Plaintiff has failed to comply with applicable statutory requirements.   "A certificate of registration, if timely obtained, is prima facie evidence both that a copyright is valid and that the registrant owns the copyright."   *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 141 (5th Cir. 2004); *Norma Ribbon & Trimming, Inc. v. Little*, 51 F.3d 45, 47 (5th Cir. 1995) (citing 17 U.S.C. § 410(c)).   Plaintiff has provided a copy of the certificate of registration listing Engenium as the author of *Scheduling Workbench*.   (Doc. No. 134, Ex. B, Certificate of Registration.)   However, a certificate of registration creates only a rebuttable presumption of validity; a defendant may dispute ownership by challenging the originality or copyrightability of a plaintiff's work.   *Norma Ribbon*, 51 F.3d at 47.   Once the plaintiff provides a certificate of registration, the burden shifts to the defendants, who must demonstrate that "the work in which copyright is claimed is unprotectable (for lack of originality) or, more specifically, to prove that . . . the copyrighted work actually taken is unworthy of copyright protection."   *Montgomery v. Noga*, 168 F.3d 1282,

1289 (11th Cir. 1999); *CMM Cable Rep, Inc. v. Ocean Coast Props., Inc.*, 97 F.3d 1504, 1513 (1st Cir. 1996).

## 1.  Ownership of copyright

Defendants argue first that Plaintiff does not actually own the *Scheduling Workbench* code that Defendants allegedly copied.  (Defs.' Mot. for Summ. J., at 8–10; Defs.' Reply, at 2–7.)  Defendants argue that the DLA vests ownership of most of the allegedly infringed aspects of *Scheduling Workbench* in SAP, and the MLA transfers ownership of any remaining allegedly infringed aspects of *Scheduling Workbench* to ConocoPhillips.  (*Id.*)  Specifically, they contend that the DLA's definitions of "enhancement" and "modification" apply to a number of the features of *Scheduling Workbench*, making those features the property of SAP.  (Defs.' Reply, at 2–5.)  Accordingly, they contend, Engenium transferred its copyright ownership, as contemplated by 17 U.S.C. § 204.[9]  Plaintiff responds that courts have repeatedly held that alleged infringers not party to an agreement transferring copyright ownership may not avoid liability by invoking the agreement.  (Pl.'s Surreply, at 6–7.)  Plaintiff also argues that, in any event, the DLA vests ownership of *Scheduling Workbench* in Plaintiff, and the MLA makes clear that ConocoPhillips only owns a license to use any subsequent versions of *Scheduling Workbench*.  (Pl.'s Surreply, at 3–5; Pl.'s Second Surreply, at 3–5.)

The Court concedes that, when read in a vacuum, the definition of "enhancement" in the DLA could potentially apply to some of the features of *Scheduling Workbench*.[10]  For instance,

---

[9] 17 U.S.C. § 204 provides in relevant part that "[a] transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent."

[10] On the other hand, the Court is aware of no features of *Scheduling Workbench* that could be classified as a "modification."  Defendants allege that Total Network Scheduling ("TNS") feature is a modification.  (Defs.' Reply, at 4.)  However, Defendants provide no evidence for the contention that TNS is alteration to the SAP software . . . "in which original SAP content is replaced with the modified content."  (DLA ¶ 1.12.)  Defendants cite to Iain Ross' declaration in support of this argument; however, the portion of Ross' declaration cited to support this argument does not indicate that portions of standard SAP code were replaced to create Engenium's TNS feature.

the material availability check feature "incorporates [SAP's material availability] code into its component . . . but customizes it with five new buttons to give additional features to the user." (Muppavarapu Report, at 26.)  Such a feature could be understood as "development utilizing the SAP development environment, SAP published APIs and/or libraries to create a new object supporting an existing business scenario that customizes, enhances or changes in any other way existing SAP functionality."  (DLA ¶ 1.7.)  However, new icons that provide additional reports may also be considered a "development[] utilizing the SAP development environment, SAP published APIs and/or libraries to create a new object that adds new and independent functionality, and branches off from the published SAP APIs and/or user exits," which would make *Scheduling Workbench*'s material availability check feature an add-on.  (*Id.* ¶ 1.1; Muppavarapu Report, at 26.)  The examples of enhancements provided in the DLA include "alternative user interfaces" and "additional business content within *existing functionality*." (DLA ¶ 1.7 (emphasis added).)  Additional icons that produce new reports do not fit neatly with these examples.  *Scheduling Workbench*'s material availability feature is better understood as an add-on, because it offers new functionality.  (*See* DLA ¶ 1.1.)

Defendants also contend that the capacity availability feature of *Scheduling Workbench* is an enhancement.  (Defs.' Reply, at 4.)  The parties have not submitted sufficient information on this feature for the Court to determine whether it satisfies the definition of an enhancement under the DLA.  The parties have told the Court only that the *Scheduling Workbench* capacity availability feature incorporates a SAP function module, but includes a custom variable and three custom lines of code.  (*Id.*; Muppavarapu Report, Ex. J., at 13.)  Because the parties have not presented evidence as to whether these customizations create new and independent functionality

---

(*See* Defs.' Reply, at 4; Doc. No. 156-1, Ross Decl. ¶¶ 13–14.)  Indeed, Ross describes Engenium's TNS as an "enhancement."  (Doc. No. 156-1, Ross Decl. ¶ 14.)

or whether they only enhance existing SAP functionality, the Court lacks a basis on which to determine if the feature is an enhancement or add-on.

However, this question of fact ultimately does not preclude the Court from resolving the parties' infringement dispute.  Plaintiff correctly points out that numerous courts, including this one, have held that alleged infringers may not avoid liability by arguing that a plaintiff does not own the copyright at issue due to defects in a copyright transfer agreement between the plaintiff and a non-party transferor.  *Billy-Bob Teeth, Inc. v. Novelty, Inc.*, 329 F.3d 586, 592–93 (7th Cir. 2005) ("[W]here there is no dispute between the copyright owner and the transferee about the status of the copyright, it would be unusual and unwarranted to permit a third-party infringer to invoke section 204(a) to avoid suit for copyright infringement."); *Imperial Residential Design, Inc. v. Palms Dev. Group, Inc.*, 70 F.3d 96, 99 (11th Cir. 1995) (explaining that because the purpose of 17 U.S.C. § 204 "is to resolve disputes between copyright owners and transferees and to protect copyright holders from persons mistakenly or fraudulently claiming oral licenses or copyright ownership," a third-party infringer may not rely on § 204 in a suit for copyright infringement); *Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27 (2nd Cir. 1982); *Fleming v. Miles*, 181 F. Supp. 2d. 1143, 1158 (D. Or. 2001); *Monroig v. RMM Records & Video Corp.*, 194 F.R.D. 388, 391 (D. P.R. 2000); *Wood v. B L Building Co.*, No. H–03–713, 2004 WL 5866352, at *6 (S.D. Tex. June 22, 2004).

In this case, unlike the above precedents, Defendants argue that the DLA and the MLA *are* valid transfer agreements, and Engenium has successfully transferred ownership to SAP and ConocoPhillips under 17 U.S.C. § 204.  However, the precedents cited by Plaintiff are equally applicable; where there is no dispute between contracting parties as to the ownership of the copyright, a defendant accused of infringement may not avoid liability by arguing that the

25

contract actually worked a transfer of ownership.  *See Billy-Bob*, 329 F.3d at 592–93.  SAP itself

agrees that *Scheduling Workbench* is owned by Engenium, as evidenced by the fact that SAP

certified *Scheduling Workbench* as an add-on.  (Doc. No. 173-2, SAP Integration Certificate;

Doc. No. 173-3, SAP Add-on Test Report for Interface Certification.)  Because SAP agrees that

Engenium is the owner of the copyright at issue, Defendants ought not be permitted to avoid

liability by arguing that SAP actually owns the copyright.  Thus, even if Defendants could

produce evidence that would support their contention that the capacity availability feature of

*Scheduling Workbench* falls under the definition of an enhancement under the DLA, such an

argument is not an appropriate defense to a copyright infringement suit.

Defendants' argument that Engenium transferred ownership of certain aspects of

*Scheduling Workbench* to ConocoPhillips under the MLA fails for the same reasons.  While it is

not entirely clear from the MLA whether the changes made to *Scheduling Workbench* at

ConocoPhillips' request constitute "work product" owned by ConocoPhillips, or are merely

"updates," "versions," or "releases" owned by Engenium (*compare* Doc. No. 158, MLA, Ex. A,

at 1 *with*  Doc. No. 158, MLA ¶ 15.4), the Court need not resolve the matter.  Defendants may

not rely on an agreement transferring copyright ownership to avoid liability in an infringement

suit.[11]

## 2.  Validity of copyright

### a.  Originality

---

[11] Defendants also argue that, even if the copyrighted features of *Scheduling Workbench* are add-ons, Plaintiff has agreed, under the DLA, not to enforce its rights in those add-ons against any commercial partners or customers of SAP.  (*See* DLA ¶ 2.3.4.5.)  Even so, "a third party may only enforce a contract when the contracting parties themselves intend to secure some benefit for the third party and entered into the contract directly for the third party's benefit."  *S. Tex. Water Auth. v. Lomas*, 223 S.W.3d 304, 306 (Tex. 2007); *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 651–52 (Tex. 1999).  There is a presumption against conferring third-party beneficiary status.  *MCI*, 9995 S.W.2d at 652.  "The fact that a person might receive an incidental benefit from a contract to which he is not a party does not give that person a right of action to enforce the contract."  *Id.* at 651.  Defendants have offered no proof that SAP and Engenium contracted with the intent to benefit commercial partners of SAP, such as Defendants.  Accordingly, Defendants may not enforce this provision of the DLA against Engenium.

Defendants also challenge Engenium's ownership by arguing that *Scheduling Workbench* is not original.  (Defs.' Mot. for Summ. J., at 10–13.)  Specifically, Defendants argue that portions of Engenium's source code are derived from SAP and are SAP-owned, and other portions of the code had been independently developed by Ross before he had been hired to do work for Engenium.  (*Id.* at 12; Defs.' Resp., at 13–14.)[12]  "Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 345 (1991) (citing 1 M. Nimmer & D. Nimmer, Copyright §§ 2.01[A], [B] (1990)).  The Supreme Court went on to explain that "the requisite level of creativity is extremely low; even a slight amount will suffice.  The vast majority of works make the grade quite easily, as they possess some creative spark, no matter how crude, humble or obvious it might be."  *Id.* (citation omitted).  However, "copyright protection [extends] only to those components of a work that are original to the author." *CMM Cable Rep*, 97 F.3d at 1516.  Where a plaintiff has produced prima facie evidence of originality, "the presumption [of ownership] will not be overcome unless the defendant offers proof that the plaintiff's product was copied from other works or similarly probative evidence as to originality."  *Id.* at 1513 (citing *Masquerade Novelty, Inc. v. Unique Indus., Inc.*, 912 F.2d 663, 668–69 (3d Cir. 1990)).

Plaintiff claims copyright infringement of *Scheduling Workbench*'s source code.  (Pl.'s Partial Mot. for Summ. J., at 2, 19–26 (noting that the source code is at issue in this case, and analyzing similarities in source code between *Scheduling Workbench* and *Harmonix*).)  Because Plaintiff's claims involve infringement of the source code, and not other non-literal elements, the

---

[12] Defendants include the latter argument as evidence that *Scheduling Workbench* is not copyrightable.  (Defs.' Resp., at 13–14.)  The Court finds this argument bears more on originality than copyrightability, and analyzes it here.

Court need only determine whether the source code of *Scheduling Workbench* is original and copyrightable.[13]

The Court begins from the "well settled" proposition that "literal elements of computer programs, i.e., their source and object codes, are the subject of copyright protection."  *Computer Assoc. Int'l v. Altai, Inc.*, 982 F.2d 693, 706–11 (2d Cir. 1992) (collecting cases); *see also eScholar, LLC v. Otis Educ. Sys., Inc.*, No. 04 Civ. 4051(SCR), 2005 WL 2977569, at *17 (S.D.N.Y. Nov. 3, 2005) ("The literal elements of a program, like source and object code, are almost always found to be protectable expression.").  Thus, in seeking to rebut the presumption of originality created by the certificate of registration and argue that source code of a software program is not original or copyrightable, Defendants bear a heavy burden.

Defendants' assertions that "the vast majority" of *Scheduling Workbench* is "SAP-derived and SAP-owned" cannot defeat the presumption of originality created by the certificate of registration.  First, the only evidence Defendants cite in support of this argument are the expert reports of Wright and Faiola, which the Court has already ruled are not admissible.  Furthermore, even if the reports were admissible, the portion of Faiola's report cited actually states the very opposite: Faiola concludes that the source code of Engenium's software is "custom written," while Symphonic's is derived from SAP standards.  (Faiola Report ¶ 35.)  The portion of Wright's report cited also does not support the contention that the source code of *Scheduling Workbench* is owned by SAP.  (Wright Report ¶ 15.)  Defendants do not produce any

---

[13]  The only argument in Plaintiff's Motion for Partial Summary Judgment that arguably concerns non-literal elements is Plaintiff's argument about how data is populated into Microsoft Excel.  (Pl.'s Partial Mot. for Summ. J., at 25.)  However, this argument is ultimately about the source code as well; data populates begins on line 18 of a Microsoft Excel spreadsheet in both *Scheduling Workbench* and *Harmonix* because the "code functions identically to populate data beginning on Row 18."  (Muppavarapu Report, Ex. G, at 9.)

   In response to Plaintiff's Motion for Partial Summary Judgment, Defendants raise arguments about non-literal elements of *Scheduling Workbench*, such as its overall appearance.  (Defs.' Resp., at 15.)  They also raise arguments about Engenium's user manual.  (*Id.* at 15–16.)  Given that Plaintiff only moves for summary judgment as to infringement of its source code, the Court finds these arguments nonresponsive and irrelevant.

evidence showing that *Scheduling Workbench* is nothing more than "SAP-derived and SAP-owned" code.  *See Norma Ribbon*, 51 F.3d at 47 ("[A] work may be protected by copyright even though it is based on . . . something already in the public domain if the author, through his skill and effort, has contributed a distinguishable variation from the older works." (citation omitted)).

Nor do Defendants provide any evidence that the code for *Scheduling Workbench*'s Microsoft Project and Microsoft Excel punchout features is merely a copy of code Ross had previously developed.  In support of this argument, Defendants cite to Ross' declaration and emails between Shetty and Ross.  (*See* Defs.' Resp., at 14.)  However, the portion of Ross' declaration that is cited provides that Ross had a "basic solution in code" to the job posting Carr has posted, but goes on to state that he and Carr "set about developing the most efficient MSP and Excel enhancements we could to meet COP's needs."  (Doc. No. 156-1, Ross Decl. ¶ 5.) This does not support the contention that *Scheduling Workbench* contains a mere copy of pre-existing code; indeed, it suggests that while Ross possessed code which would be a useful starting point for building certain features of *Scheduling Workbench*, Ross and Carr ultimately has to develop code to meet ConocoPhillips' needs.  The email string cited by Defendants provides only what appears to be a brief conceptual outline of a program Ross was developing for Engenium and indicates that Ross would "hunt around and look at my old documentation to see if I have anything useful."  (Doc. No. 156-10, Nov. 19, 2009 Emails between Shetty and Ross.)  The Court fails to see the relevance of these emails.

The Court finds that Defendants have offered no evidence that *Scheduling Workbench* lacks the minimal degree of creativity necessary to qualify as an original work.  *See Feist*, 499 U.S. at 345.

### b.  Copyrightability

Defendants also contend that the source code Engenium claims is copyrighted is actually uncopyrightable *scenes a faire*. (Defs.' Mot. for Summ. J., at 11–13; Defs.' Resp., at 11–15.) Specifically, they argue that line breaks, indentation, formatting, the commented out code, the material availability check feature, and the Microsoft Excel and Microsoft Project punchout features are all *scenes a faire*. (Defs.' Resp., at 11–15.)[14]  *Scenes a faire* is defined as "expressions that are standard, stock or common to a particular subject matter or are dictated by external factors." *Eng'g Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335, 1344–45 (5th Cir. 1994). "A programmer's freedom of design choice is often circumscribed by extrinsic considerations such as . . . compatibility requirements of other programs with which a program is designed to operate in conjunction[,] . . . demands of the industry being serviced[,] and . . . widely accepted programming practices within the computer industry." *Computer Assocs. Int'l v. Altai, Inc.*, 982 F.2d 693, 709–10 (2d Cir. 1992). When external factors necessitate a certain expressive form, granting copyright to that expression "would effectively afford a monopoly to the first programmer to express those ideas." *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d 823, 838 (10th Cir. 1993).

Defendants first argue that the line breaks, indentation, and formatting of *Scheduling Workbench* are dictated by external factors, specifically the use of a SAP formatting program. (Defs.' Resp., at 12–13.) Plaintiff's expert, Muppavarapu, points out numerous places where spacing and indentation in *Scheduling Workbench* and *Harmonix* are identical. (Muppavarapu Report, at 17–20; Muppavarapu Report, Ex. G, at 4.) He states that "in my experience as a software programmer, no two developers can independently format their code as identical[ly] as seen in *Harmonix* [and *Scheduling Workbench*.]" (Muppavarapu Report, at 18.) Ross explains

---

[14] Defendants make substantially similar arguments in their own Motion for Summary Judgment, but do not delineate them as clearly. (*See* Defs.' Mot. for Summ. J., at 11–13.) Hence, the Court addresses their arguments as posed in their Response to Plaintiff's Motion for Partial Summary Judgment.

that formatting in SAP programs is automatically performed by a SAP program called *Pretty Printer*.  (Doc. No. 156-1, Ross Decl. ¶ 12.)[15]  Accordingly, an issue of fact exists as to whether the formatting of both programs is the result of external factors.

Defendants next argue that the commented out code is *scenes a faire* because it is common practice for programmers to use code they previously personally developed.  (Defs.' Resp., at 13.)  Defendants raise the same argument regarding the Microsoft Excel and Microsoft Project punchout features.  (*Id.* at 14.)  Defendants misunderstand the *scenes a faire* doctrine.  The doctrine provides that *expressions* that are common to a particular subject or dictated by external factors are uncopyrightable.  *Eng'g Dynamics*, 26 F.3d at 1344–45; *see also Compaq Computer Corp. v. Ergonome, Inc.*, 137 F. Supp. 2d 768, 777 (S.D. Tex. 2001); *Parker v. Outdoor Channel Holdings*, No. 2–11–CV–00159–J, 2012 WL 6200177, at *3, 5 (N.D. Tex. Dec. 12, 2012).  So, for instance, when widely accepted programming practices or industry needs mandate a given idea be expressed in a certain way, the code used to express that idea may be *scenes a faire*.  *Gates Rubber*, 9 F.3d at 838; *Compaq*, 137 F. Supp. 2d at 777; *see also* 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 13.03[F][3][e] (2007).  The Court is aware of no precedent suggesting that if professionals in a given field frequently recycle previously developed material, any recycled material is transformed into uncopyrightable *scenes a faire*.

Defendants also contend that the commented out code is based on SAP and Microsoft standards available to all programmers.  (Defs.' Resp., at 13.)  The citation to Ross' declaration in support of this statement says no such thing.  (*See id.*; Doc. No. 156-1, Ross Decl. ¶¶ 24–25.)

---

[15] As explained *supra* in Part II.D n.8, to the extent that Ross is testifying as an expert, his testimony is inadmissible.  However, Ross, as the developer of portions of *Scheduling Workbench* and *Harmonix*, may speak as a fact witness as to how each program was formatted.  The Court understands Ross' statement to indicate that he knows *Pretty Printer* was used to format *Scheduling Workbench* and *Harmonix*.

Furthermore, even if the commented code is *based on* SAP and Microsoft standards, this fact alone would not make the commented out code uncopyrightable *scenes a faire*; only those portions of the source code that actually *are* SAP and Microsoft standard code would be *scenes a faire*. Defendants do not identify any such code in *Harmonix* or *Scheduling Workbench*.

Defendants raise a similar argument with regard to how data is populated into Microsoft Excel from *Scheduling Workbench* and *Harmonix*: they contend the data is populated in a similar way because Ross used samples provided by Microsoft. (Defs.' Resp., at 14.) Again, the portion of Ross' declaration Defendants cite says no such thing. (*See id.*; Doc. No. 156-1, Ross Decl. ¶¶ 5–7.) Ross does state in his declaration that he developed a Gantt template based on free templates online. (Doc. No. 156-1, Ross Decl. ¶ 12.) However, he also states that Engenium's client had "some very specific requirements" and *Scheduling Workbench* was modified to accommodate those requirements. (*Id.*) As explained above, merely basing code on other templates does not suggest that the entire source code for a program is *scenes a faire*. Furthermore, Ross readily admits that he made additional changes to the code he developed based on the free templates. (*Id.*)

Defendants also contend that both the Microsoft Excel punchout feature of Scheduling Workbench and the Material Availability feature are *scenes a faire* because they are based on industry standards. (Defs.' Resp., at 14–15.) Defendants cite no evidence to support their claim with regard to the Microsoft Excel punchout feature, and cite only two paragraphs of Carr's declaration with regard to the material availability punchout feature. (*See id.*; Doc. No. 156-4, Carr Decl. ¶¶ 8, 10.) Paragraph eight of Carr's declaration contains no information that can conceivably support this assertion. (Doc. No. 156-4, Carr Decl. ¶ 8.) Paragraph ten of Carr's declaration states only that it is common for material availability program to use operational

features present in SAP because customers expect SAP-standard information in a material check program.  (*Id.* ¶ 10.)  This statement does not support the contention that the *customized* features of *Scheduling Workbench*'s material availability check feature are *scenes a faire*.  Plaintiff seeks copyright protection for the customized features of *Scheduling Workbench*'s material availability check feature; indeed, Plaintiff readily concedes that its material availability program includes SAP-standard features in addition to the customized features.  (*See* Muppavarapu Report, at 26; Pl.'s Resp., at 7.)  Defendants have produced no evidence that Engenium's customized material availability check feature is either merely a copy of SAP, or is otherwise a function of industry standards.

Plaintiff has produced a certificate of registration, creating a rebuttable presumption that the copyright on *Scheduling Workbench* is valid.  Defendants have not offered any proof that Engenium copied *Scheduling Workbench* from another work.  Nor have they shown that *Scheduling Workbench* is comprised entirely of uncopyrightable elements.  Accordingly, Defendants have not rebutted Plaintiff's prima facie showing of a valid copyright.  *CMM Cable Rep*, 97 F.3d at 1516; *Noga*, 168 F.3d at 1289–91.  The Court finds that Plaintiff owns a valid copyright on *Scheduling Workbench*.

### ii.   Copying

The second element of a copyright infringement claim is copying.  *Positive Black Talk Inc. v. Cash Money Records, Inc.*, 394 F.3d 357, 367 (5th Cir. 2004), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010).  To show actionable copying, a plaintiff must prove: (1) factual copying and (2) substantial similarity.  *Positive Black Talk*, 394 F.3d at 367; *Eng'g Dynamics*, 26 F.3d at 1340–1341.  After establishing these threshold requirements, a plaintiff must prove that a defendant "*used* the accused copies in any of the ways described in Section 106 of the Copyright Statute."  *Playboy Enter., Inc. v. Russ Hardenburgh,*

*Inc.*, 982 F. Supp 503, 209 (N.D. Ohio 1997); *Playboy Enter., Inc. v. Webbworld, Inc.*, 991 F. Supp. 543, 551 (N.D. Tex. 1997)*.*

### 1. Factual copying

The first prong of actionable copying concerns "whether the alleged infringer copied, or 'actually used the copyrighted material in his own work.'" *Bridgmon v. Array Sys. Corp.*, 325 F.3d 572, 576 (5th Cir. 2003) (quoting *Eng'g Dynamics*, 26 F.3d at 1340). "Factual copying can be proven by direct or circumstantial evidence." *Positive Black Talk*, 394 F.3d at 367–68 (citing *Bridgmon*, 325 F.3d at 576). "As direct evidence of copying is rarely available, factual copying may be inferred from (1) proof that the defendant had access to the copyrighted work prior to creation of the infringing work and (2) probative similarity." *Id.* at 368 (citing *Peel & Co. v. Rug Market*, 238 F.3d 391, 394 (5th Cir. 2001)). "If a plaintiff establishes an inference of factual copying (by showing access and probative similarity), the defendant can rebut that inference, and thus escape liability for infringement, if he can prove that he independently created the work." *Id.* (citing *Peel*, 238 F.3d at 398; *Miller v. Universal City Studios, Inc.*, 650 F.2d 1365, 1375 (5th Cir. 1981)).

### a. Access

"Access has been defined to include an opportunity to view the copyrighted work." *Ferguson v. National Broadcasting Co., Inc.*, 584 F.2d 111, 113 (5th Cir. 1978) (citing 3 M. Nimmer, Nimmer on Copyright § 13.02(A) (1978)). A plaintiff must establish "a reasonable possibility of access" by the defendant. *Peel*, 238 F.3d at 395. However, "[i]f the two works are so *strikingly* similar as to preclude the possibility of independent creation, 'copying' may be proved without a showing of access." *Id.* at 394 (emphasis in original).

Plaintiff has clearly met its burden on the first element of actual copying. During his time at Engenium, Carr had access to *Scheduling Workbench*'s code. (Doc. No. 134, Ex. D,

Carr's Responses to Defs.' Reqs. for Admission, No. 6.)   Carr did not resign from Engenium until August 18, 2010.  (Doc. No. 138-5, Carr Decl. ¶¶ 8, 14; Doc. No. 134, Pl.'s Partial Mot. for Summ. J. ¶ 19.)  However, by August 10, 2010, Carr had already filed a Certificate of Formation for Symphonic.  (Doc. No. 11, Ex. B, Certificate of Formation.)  Thus, for at least eight days after forming his new corporation, Carr indisputably had access to *Scheduling Workbench*'s code.

Furthermore, as part of the work he performed for Engenium, Ross maintained a copy of *Scheduling Workbench* on his personal server, DM0.  (Doc. No. 156-4, Carr Decl. ¶¶ 6–7; Doc. No. 156-9, Feb. 11, 2010 Email from Shetty.)  Although parties disagree as to when or whether *Scheduling Workbench* was deleted from DM0, Ross continued to have access to *Scheduling Workbench* in late August of 2010, around the same time that he was hired by Symphonic.  (Doc. No. 156-4, Carr Decl. ¶¶ 6–7; Doc. No. 156-9, Feb. 11, 2010 Email from Shetty; Doc. No. 138-3, Ross Decl. ¶¶ 44, 50.)  This timeline suggests that Symphonic had a "reasonable possibility of access" to *Scheduling Workbench* through Ross as well.  *Peel*, 238 F.3d at 395.

### b.  Probative Similarity

"In evaluating probative similarity, a court should compare the works in their entirety, including both protectible and unprotectible elements."  *Straus v. DVC Worldwide, Inc.*, 484 F. Supp. 2d 620, 635 (S.D. Tex. 2007) (citing *Positive Black Talk*, 394 F.3d at 370 n.9).  As the Fifth Circuit explained in *Positive Black Talk*,

> [t]his is appropriate because although the plaintiff must ultimately establish infringement by showing that the defendant copied a substantial amount of protectable elements, (i.e., meet the "substantial similarity" standard), the fact that non-protectable elements were copied, although not a basis for liability, can be probative of whether protected elements were copied (i.e., help establish probative similarity).

*Positive Black Talk*, 394 F.3d at 370 n.9 (citing *O.P. Solutions, Inc. v. Intellectual Prop. Network, Ltd.*, No. 96 Civ. 7952, 1999 WL 47191, at *3 (S.D.N.Y. Feb. 2, 1999)). "While probative similarity and substantial similarity are distinct tests that should be analyzed separately, the same evidence can be used to satisfy both tests." *Seastrunk v. Darwell Integrated Tech., Inc.,* No. 3:05-CV-0531-BF(G) ECF, 2008 WL 898766, at *9 (N.D. Tex. March 28, 2008) (citing *Bridgmon*, 325 F.3d at 577 n.8).

The Court finds that, on the evidence presented, Plaintiff meets its burden of showing probative similarity between a number of features in *Scheduling Workbench* and *Harmonix*. The following evidence amply supports this conclusion:

- A comparison of the source code between an early version of a *Harmonix* feature that schedules work orders and operations and a feature that performs a similar function in *Scheduling Workbench* reveals approximately twenty lines of different code out of twenty-two and a half pages of code. (Muppavarapu Report, at 17–18; Muppavarapu Report, Ex. M.)

- The features that enable data to be transferred to Microsoft Project contain numerous identical lines of source code, including identical comments and variable names. (Muppavarapu Report, at 23–26; Muppavarapu Report, Ex. H.)

- *Harmonix* and *Scheduling Workbench* contain several identical non-functional characteristics, such as identical line breaks, spacing, and indentation, identical loading language and timing of loading message, and population of data into a Microsoft Excel spreadsheet beginning at the same arbitrary line number. (Muppavarapu Report, at 18–21, 25; Muppavarapu Report, Ex. G; Muppavarapu Report, Ex. I.)

- The macros[16] found in the Microsoft Excel punchout features of *Scheduling Workbench* and *Harmonix* have identical names and contain similar code. (Muppavarapu Report, at 19; Muppavarapu Report, Ex. G, at 10–11.)

- *Harmonix*'s customized material availability check feature is comprised entirely of basic SAP material availability functionality and four of the five customized icons found in *Scheduling Workbench*'s material availability check. (Muppavarapu Report, at 26.)

---

[16] A macro is "a collection of commands that can be applied with a single click." (Muppavarapu Report, at 23 n.3.)

- *Harmonix*'s customized material availability check feature contains obsolete code for functionality it does not offer, but which can be found in *Scheduling Workbench*. (Muppavarapu Report, at 29.)

- *Harmonix* and *Scheduling Workbench* use identical variables, and *Harmonix* defines variables which are never referenced in its code, but which are referenced in *Scheduling Workbench*'s code.   (Muppavarapu Report, at 32–36; Muppavarapu Report, Ex. G.)

Defendants offer no admissible evidence that casts any doubt on Muppavarapu's findings.   Rather, they merely contend that other courts have refused to find substantially similarity[17] when presented with differences between a plaintiff's and defendant's products. (Defs.' Mot. for Summ. J., at 14.)   Courts have recognized that "differences in total concept and feel" may preclude a finding of substantial similarity.   *Randolph v. Dimension Films*, 630 F. Supp. 2d 741, 748–49 (S.D. Tex. 2009) (citing *Williams v. Crichton*, 84 F.3d 581, 589 (2d Cir. 1996); *Hogan v. DC Comics*, 48 F. Supp. 2d 298, 31 (S.D.N.Y. 1999)).   However, courts have also recognized that it may be "entirely immaterial that, in many respects, plaintiff's and defendants' works are dissimilar, if in other respects, similarity as to a substantial element of plaintiff's work can be shown."   *Attia v. Soc'y of N.Y. Hosp.*, 201 F.3d 50, 57–58 (2d Cir. 1999) (citations omitted); *see also Shaw v. Lindheim*, 919 F.2d 1353, 1362 (9th Cir. 1990) ("No plagiarist can excuse the wrong by showing how much of his work he did not pirate.") (citations omitted).   The Court need not determine how these lines of precedent might operate in a case where both notable similarities and conceptual differences exist.   Defendants have not submitted any admissible evidence of conceptual differences between *Scheduling Workbench* and *Harmonix* that would preclude a finding of probative similarity.

---

[17] Neither Plaintiff nor Defendants recognize that the access analysis requires a showing of probative similarity, rather than substantial similarity.   *Positive Black Talk*, 394 F.3d at 370 n.9 (citing *O.P. Solutions, Inc. v. Intellectual Prop. Network, Ltd.*, No. 96 Civ. 7952, 1999 WL 47191, at *3 (S.D.N.Y. Feb. 2, 1999)).

Defendants do little more than suggest that the allegedly copied items make up a small percentage of the source code of both *Scheduling Workbench* and *Harmonix*.  (Defs.' Mot. for Summ. J., at 14.)  Even if this is true, and even if Defendants had admissible evidence to support this contention,[18] it does not preclude a finding of probative similarity.  As Nimmer explains,

> The question in each case is whether the similarity relates to matter that constitutes a substantial portion of plaintiff's work—not whether such material constitutes a substantial portion of defendant's work. . . . The quantitative relation of the similar material to the total material contained in plaintiff's work is certainly of importance. However, even if the similar material is quantitatively small, if it is qualitatively important, the trier of fact may properly find substantial similarity.

4 Nimmer **on Copyright § 13.03[A][2][a]**.  Although the preceding guidance is offered in reference to substantial similarity, the Court sees no reason why it would not be equally applicable to probative similarity.

Even if Defendants are correct that the allegedly infringing *Harmonix* source code infringes on only four percent of *Scheduling Workbench*'s source code, the record contains evidence of the significance of the code that is infringed upon.  Grant's report indicates that the Microsoft Excel and Microsoft Project punchout features are "very unique."  (Grant Report, at 18.)  Indeed, Grant states that he has "never seen this functionality except within Engenium and Symphonic."  (*Id.*)  Similarly, four of the five icons in *Scheduling Workbench*'s material availability program, and the obsolete code for the fifth icon, are the only features in *Harmonix*'s material availability program not present in SAP's material availability program.  (**Muppavarapu Report, at 26.**)  The Court agrees with Plaintiff that the "*quality* of work copied" here is significant.  (Pl.'s Mot., at 26 (emphasis in original).)  Defendants have not presented any evidence that suggests that the similarities in source code pertain to "nonessential matters." *Newton v. Diamond*, 388 F.3d 1189, 1195 (9th Cir. 2004) (recognizing that if "the similarity is

---

[18] *See infra* Part II.D n.8 for an explanation of why Ross' testimony on this point is not admissible.

only as to nonessential matters, then a finding of no substantial similarity should result.") (citing 4 Nimmer on Copyright § 13.03[A][2], at 13-48).

On the evidence presented, no jury could reasonably conclude that probative similarity is lacking between *Scheduling Workbench* and *Harmonix*. Because Plaintiff has shown access and probative similarity, Plaintiff has proven factual copying.

### c.  Independent creation

Defendants may rebut a showing of factual copying by showing that *Harmonix* was independently created. *Positive Black Talk*, 394 F.3d at 368 (citations omitted). Defendants contend that the similarities between the source code of *Harmonix* and *Scheduling Workbench* are just as likely to have resulted from independent creation because the code for each program was created by the same programmer. (Defs.' Mot. for Summ. J., at 12.)[19] Defendants cite only one paragraph of Ross' declaration in support of this argument, which contains no relevant information. (*See id.*; Doc. No. 138-3, Ross Decl. ¶ 39.) The Court is not convinced by this blanket assertion. Even if the same programmer is responsible for two programs, the Court finds it highly unlikely that such a substantial amount of identical code could occur absent copying. (*Cf.* Muppavarapu Report, at 17.)

### 2.  Substantial similarity

In addition to showing factual copying, a plaintiff must also show that the copyrighted work and the allegedly infringing work are substantially similar. *Positive Black Talk*, 394 F.3d at 368 (citing *Bridgmon*, 325 F.3d at 577). "[A] side-by-side comparison must be made between the original and the copy to determine whether a layman would view the two works as

---

[19] Defendants also argue that the structure and display similarities between the programs are just as likely to be a result of independent creation. (Defs.' Mot. for Summ. J., at 12.) As the Court has explained *supra* Part III.B.i.2 n.12, Plaintiff's copyright infringement claims are based on copying of source code, a literal element, not nonliteral elements. Accordingly, these arguments are irrelevant.

'substantially similar.'"  *Creations Unlimited, Inc. v. McCain*, 112 F.3d 814, 816 (5th Cir. 1997). In conducting the substantial similarity analysis, the court should consider only whether the allegedly infringing product is substantially similar to the protectable aspects of plaintiff's product. *Eng'g Dynamics*, 26 F.3d at 1347; *cf. Positive Black Talk*, 394 F.3d at 370 n.9 (citation omitted).  Although summary judgment on the issue of substantial similarity "typically should be left to the factfinder," summary judgment is appropriate if a court can conclude, after drawing all reasonable inferences in favor of the nonmoving party, that no reasonable juror could find in favor of the nonmovant.  *Peel*, 238 F.3d 391; *see also Silver Ring Splint Co. v. Digisplint, Inc.,* 543 F. Supp. 2d 509, 519 (W.D. Va. 2008).

Several circuits have held that the abstraction-filtration-comparison analysis developed by the *Altai* court to analyze copyright infringement claims regarding nonliteral elements of computer software should be used to analyze claims of literal infringement as well.  *Altai,* 982 F.2 at 707–711; *Bateman v. Mnemonics, Inc.*, 79 F.3d 1532, 1545 (11th Cir. 1996); *Gates Rubber*, 9 F.3d at 842–45.  Briefly, the abstraction-filtration-comparison analysis is as follows: First, a court "dissects the allegedly copied program's structure and isolate[s] each level of abstraction contained within it."  *Altai*, 982 F.2d at 707.  The purpose of this step is to separate ideas, which are uncopyrightable, from expressions, which are protectable.  *eScholar*, 2005 WL 2977569, at *24.  Then, at the filtration stage,  the court considers components of each level of abstraction, to determine whether a given component is not protectable.  *Id.*  At the final stage, "[a]fter the non-protected elements of the original computer program have been filtered out, then the original and subsequent programs are compared.  *Id.* at *26 (citing *Altai*, 982 F.2 at 711). The First Circuit, however, has held that the abstraction-filtration-comparison analysis should not be used to assess claims of literal infringement, explaining:

> In fact, we think that the *Altai* test in this context may actually be misleading because, in instructing courts to abstract the various levels, it seems to encourage them to find a base level that includes copyrightable subject matter that, if literally copied, would make the copier liable for copyright infringement.  While that base (or literal) level would not be at issue in a nonliteral-copying case like *Altai,* it is precisely what is at issue in this appeal.

*Lotus Dev. Corp. v. Borland Int'l, Inc.*, 49 F.3d 807, 815 (1st Cir. 1995).  The Fifth Circuit has not yet addressed whether the abstraction-filtration-comparison analysis "should be used to evaluate charges that a program's source or object code was copied."  *Lee*, 379 F.3d at 143.

This Court agrees with the First Circuit that conducting the abstraction analysis contemplated by *Altai* makes little sense in a case where the infringement alleged is at the very base level of a software program.  However, as the *eScholar* court recognized, even if the abstraction-filtration-comparison analytical scheme is not strictly applied, "[f]unctionally, . . . we must apply the same 'well developed doctrines of copyright law' at *Altai*'s filtration stage to determine if each component contains copyrightable material that the defendant may have infringed."  *eScholar*, 2005 WL 2977569, at *23 (citing *Altai*, 982 F.2 at 707).  Accordingly, the Court determines whether *Scheduling Workbench* and *Harmonix* are substantially similar without conducting the abstraction analysis used for nonliteral claims of infringement; however, it nonetheless conducts the functional equivalent of *Altai*'s filtration analysis and excludes from its comparison those elements of *Scheduling Workbench* that are not copyrightable.

Although the standard for probative similarity mandates that courts compare plaintiff's and defendant's works in their entirety, including those elements that are not copyrightable, *see Straus*, 484 F. Supp. 2d at 635 (citing *Positive Black Talk*, 394 F.3d at 370 n.9), the Court finds that, in this case, the analysis for probative similarity and substantial similarity is essentially the same.  As explained *supra* Part III.B.i.2.b, the only aspects of *Scheduling Workbench* that Plaintiff seeks protection for but which might constitute uncopyrightable *scenes a faire* are the

41

line breaks, indentation, and formatting of *Scheduling Workbench*.[20]   While the formatting characteristics that were considered by the Court in finding probative similarity may not be considered in determining substantial similarity at the summary judgment phase, all of the other similarities identified *supra* Part III.B.ii.1.b may be considered.

There exists a high degree of similarity between the source code for each program's scheduling features, Microsoft Excel and Microsoft Project punchout features, and material availability check features, even absent the formatting similarities found throughout *Scheduling Workbench* and *Harmonix*.   (*See* Muppavarapu Report, at 17–19, 23–26, 29, 32–36; Muppavarapu Report, Ex. G; Muppavarapu Report, Ex. H; Muppavarapu Report, Ex. M.) Significant portions of the source code for these programs are identical in the parties' respective products.  (Muppavarapu Report, at 17–19, 23–26; Muppavarapu Report, Ex. G; Muppavarapu Report, Ex. H; Muppavarapu Report, Ex. M.)  *Harmonix* contains the exact same innovations for its material availability check as *Scheduling Workbench*.   (Muppavarapu Report, at 26, 29.) *Harmonix* and *Scheduling Workbench* use identical variable names, and *Harmonix* defines variables which it never uses in its code, but which are found in *Scheduling Workbench*'s code. (Muppavarapu Report, at 32–36; Muppavarapu Report, Ex. G.)

The Court concludes that, on this evidence, no reasonable jury could find for Defendants on the issue of substantial similarity.   All of the features within *Harmonix* highlighted by Plaintiff contain substantial similarities to the source code of corresponding *Scheduling Workbench* features.   Furthermore, evidence supports the conclusion that these portions of *Scheduling Workbench* are qualitatively significant.   (*See* Grant Report, at 18; Muppavarapu Report, at 26.)  Defendants have not offered any admissible evidence that would persuade a

---

[20] Plaintiff concedes that *Scheduling Workbench* incorporates SAP elements, and does not assert that those aspects of *Scheduling Workbench* that are merely copying SAP standard code should be considered as part of the substantial similarity analysis.  (Pl.'s Resp., at 7–9.)

reasonable juror that the protectable elements of *Scheduling Workbench* and *Harmonix* are not substantially similar.

The Court recognizes that summary judgment for Plaintiff on these issues is unusual. *See Segrets, Inc. v. Gilman Knitwear co., Inc.*, 207 F.3d 56, 62 (1st Cir. 2000) (citing 3 Nimmer on Copyright § 12.10[A], at 12-150 to 12-151). However, Plaintiff has submitted convincing evidence of substantial similarities between the protectable elements of *Scheduling Workbench* and *Harmonix*, and Defendants have offered no evidence to disprove these similarities or otherwise show their insignificance in light of the full scope of the competing products. The Court concludes that, on these facts, no reasonable juror could find otherwise.

### 3.  Exclusive rights under 17 U.S.C. § 106

Having established that *Harmonix* is a copy of *Scheduling Workbench*, Plaintiff must show that Defendants violated at least one of its exclusive rights under 17 U.S.C. § 106. *Webbworld*, 991 F. Supp. at 551. Defendants argue that Plaintiff has not proven a violation of Plaintiff's exclusive rights to reproduce under 17 U.S.C. § 106(1), prepare derivative works under 17 U.S.C. § 106(2), or to distribute copies under 17 U.S.C. § 106(3). (Defs.' Mot. for Summ. J., at 14–18.)

17 U.S.C. § 501 defines infringement as a violation of "any of the exclusive rights of the copyright owner as provided by sections 106 through 122." The statutory language makes clear that a plaintiff need not prove multiple violations of its exclusive rights to state a claim for infringement. 17 U.S.C. § 501(a); *see also Webbworld*, 991 F. Supp. at 551 ("Using, or authorizing the use of, a copyrighted work in any one of [the ways identified in 17 U.S.C. § 106(1)-(3)], without permission of the copyright owner, constitutes actionable copyright infringement"); *Atlantic Recording Corp. v. Howell,* 554 F. Supp. 2d 976, 980–81 (D. Ariz. 2008) (A plaintiff in a copyright infringement suit "must demonstrate that the

43

alleged infringers violate at least one exclusive right granted to copyright holders under 17 U.S.C. § 106.").  Thus, the Court need not determine whether Plaintiff has proven a violation of each of the exclusive rights enumerated in 17 U.S.C. § 106(1)-(3).  The Court considers only whether Plaintiff has proven that Defendants violated its exclusive rights to reproduce under 17 U.S.C. § 106(1).

"A party infringes on the owner's exclusive right to reproduce the copyrighted work when the party copies computer code without the owner's authorization." *Quantlab Techs. Ltd. (BVI) v. Godlevsky*, 719 F. Supp. 2d 766, 773 (S.D. Tex. 2010).  "One who makes copies of a copyrighted work infringes the copyright owner's *reproduction* right even if he does not also infringe the *distribution* right by sale or other disposition of such copies." *Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 787–88 n.54 (5th Cir. 1999) (citing 2 Nimmer on Copyright § 8.02[B][2], at 8–29, 30) (emphasis in original).  Here, by producing *Harmonix*, which is a factual and actionable copy of *Scheduling Workbench*'s source code, without Engenium's authorization, Defendants violated Plaintiff's exclusive right to reproduce *Scheduling Workbench* under 17 U.S.C. § 106(1).

For the reasons explained above, the Court finds that Plaintiff is entitled to summary judgment on its claim that the source code of *Harmonix* infringes on Engenium's copyright. Plaintiff's Partial Motion for Summary Judgment is **GRANTED**.  Defendants' Motion for Summary Judgment is **DENIED** with respect to copyright infringement.

### iii.  Remedies

#### 1.  Damages[21]

---

[21] Plaintiff does not appear specifically to seek damages in its present motion.  (Pl.'s Partial Mot. for Summ. J., at 30.)  The Court briefly addresses damages, however, because Plaintiff does seek a determination of willfulness, which is relevant only to damages.  (*Id.* at 27.)

17 U.S.C. § 504 allows a plaintiff to elect either actual or statutory damages as a remedy for copyright infringement.  However, 17 U.S.C. § 412 makes statutory damages unavailable for "any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work."  Here, the effective date of Plaintiff's Certificate of Registration for *Scheduling Workbench* is October 25, 2010 (Certificate of Registration.)  This is well after the first publication of *Scheduling Workbench*.  (*See, e.g.*, July 19, 2009 Invoice to ConocoPhillips.)  Defendants' infringement of Engenium's copyright began prior to the registration of *Scheduling Workbench*.  (*See, e.g.*, Muppavarapu Report, at 17 (noting that Symphonic's scheduling program had a creation date of September 3, 2010).)  Indeed, Plaintiff admits that 17 U.S.C. § 412 applies to this case.  (Pl.'s Resp., at 23 (admitting that Plaintiff cannot recover attorney's fees because of § 412).)  Accordingly, Plaintiff is not entitled to statutory damages in this case.  *See Mason v. Montgomery Data, Inc.*, 967 F.2d 135, 144 (5th Cir. 1992) (holding that "a plaintiff may not recover an award of statutory damages and attorney's fees for infringements that commenced after registration if the same defendant commenced an infringement of the same work prior to registration.")

Plaintiff appears to move for summary judgment seeking a finding that Defendants infringed on Plaintiff's copyright willfully.  (Pl.'s Partial Mot. for Summ. J., at 27.)  As Plaintiff recognizes, willfulness is not a requirement in an infringement action.  *Microsoft Corp. v. Software Wholesale Club, Inc.*, 129 F. Supp. 2d 995, 1002 (S.D. Tex. 2000).  Rather, willfulness is relevant to statutory damages.  *See* 17 U.S.C. § 504(c)(2) ("In a case where the copyright owner sustains the burden of proving, and the court finds, that infringement was committed willfully, the court in its discretion may increase the award of statutory damages to a sum of not

more than $150,000.")  As explained above, Plaintiff is not entitled to recover statutory damages in this case.  Furthermore, even if Plaintiff was entitled to statutory damages, the Supreme Court held that the Seventh Amendment guarantees parties the right to a jury trial "on all issues pertinent to an award of statutory damages under § 504(c) of the Copyright Act, including the amount itself."  *Feltner v. Columbia Pictures Television*, 523 U.S. 340, 355 (1998); *see also BMG Music v. Gonzalez*, 430 F.3d 888, 892 (7th Cir. 2005) (holding that where a plaintiff seeks more than the minimum amount of statutory damages, defendants are entitled to have a jury determine the amount); *EMI April Music Inc. v. Know Group, LLC*, No. 3:05-CV-1870-M, 2006 WL 3203276, at *5 (N.D. Tex. Nov. 6, 2006) (same).  *Feltner* mandates that the issue of willfulness be determined by a jury.  *Segrets, Inc. v. Gillman Knitwear Co., Inc.*, 207 F.3d 56, 66 (1st Cir. 2000); *see also* 4 Nimmer on Copyright § 14.04[B][3] ("Seventh Amendment concerns require that the 'court' to make the willfulness determination be the jury").  Accordingly, for numerous reasons, the Court declines to determine whether the infringement was willful in this case.

Although Plaintiff is not eligible for statutory damages, Plaintiff is entitled to actual damages.  17 U.S.C. § 504.  It is well-settled that a party has the right to have a jury determine actual damages.  *Feltner*, 523 U.S. 326 (citing *Video Views, Inc. v. Studio 21, Ltd.*, 925 F.2d 1010, 1014 (7th Cir. 1991) ("little question that the right to a jury trial exists in a copyright infringement action when the copyright owner endeavors to prove and recover its *actual* damages"); 3 M. Nimmer & D. Nimmer, Nimmer on Copyright § 12.10[B] (1997) ("beyond dispute that a plaintiff who seeks to recover actual damages is entitled to a jury trial" (footnotes omitted))).  Thus, unless the parties agree to waive their right to have a jury determine damages, this Court cannot determine damages in this case without impaneling a jury.

### 2.  Permanent Injunction

Plaintiff also seeks a permanent injunction.  (Pl.'s Partial Mot. for Summ. J., at 28–30.) This Court has the authority to grant permanent injunctions to prevailing plaintiffs in a copyright infringement suit.  17 U.S.C. § 502.  The Court will address Plaintiff's request for a permanent injunction at a subsequent date.

### 3.  Attorney's Fees

Defendants request attorney's fees as prevailing parties in a copyright infringement suit. (Defs.' Mot. for Summ. J., at 30–31.)   Because Defendants are not prevailing parties, this argument is moot.  Plaintiff admits that 17 U.S.C. § 412 bars recovery of attorney's fees in this case.  (Pl.'s Resp., at 23.)  Accordingly, no attorney's fees will be awarded in this case.

### C.  Unfair Competition/ Breach of Fiduciary Duty

Defendants seek summary judgment on Plaintiff's claims of unfair competition and breach of fiduciary duty.  (Defs.' Mot. for Summ. J., at 18–24.)[22]  They argue that a claim of unfair competition is preempted by federal copyright law, and, in any event, there is no evidence to support such a claim.  (*Id.*)[23]  Defendants also argue that the facts do not support a breach of fiduciary duty claim.  Plaintiff does not offer any response to Defendants' unfair competition arguments.  (*See generally*, Pl.'s Resp.)  Plaintiff argues that Carr breached his fiduciary duty to Engenium by usurping corporate opportunities from Engenium, and by removing funds from Engenium's account.  (*Id.* at 18–20.)

### i.  Unfair Competition

"Even where there is no response to a motion for summary judgment the moving party must establish the absence of a genuine issue of material fact before it can prevail."  *United*

---

[22] The Court takes these claims up together because it understands them to be related.  *See infra* III.C.i.

[23] Defendants also argue, throughout their Motion for Summary Judgment, that Plaintiff has failed to adequately plead certain state law claims in its complaint.  (*See, e.g.*, Defs.' Mot. for Summ. J., at 20.)  However, these arguments are properly brought in a Rule 12(b)(6) motion, not a summary judgment motion.

*States v. Eubanks*, No. No. Civ. 3–02–CV–2541–H, 2003 WL 21281640, at *3 (N.D. Tex. May

28, 2003) (citing *Resolution Trust Corp. v. Starkey*, 41 F.3d 1018, 1023 (5th Cir. 1995);

*Cushingberry v. Airtran Airways, Inc.*, No. Civ.A. 3:04-CV-2301, 2005 WL 1875429, at *1 (N.

D. Tex. Aug. 9, 2005) ("The Defendant is not automatically entitled to summary judgment

merely because there is no opposition.") (citing *Hibernia Nat'l Bank v. Admin. Cent. Sociedad

Anonima*, 776 F.3d 1277, 1279 (5th Cir. 1985)).    Accordingly, the Court must address

Defendants' argument regarding unfair competition.

Section 301(a) of the Copyright Act "accomplishes the general federal policy of creating

a uniform method for protecting and enforcing certain rights in intellectual property by

preempting other claims." *Daboub v. Gibbons*, 42 F.3d 285, 288 (5th Cir. 1995).  It provides:

> [A]ll legal or equitable rights that are equivalent to any of the exclusive rights
> within the general scope of copyright as specified by section 106 in works of
> authorship that are fixed in a tangible medium of expression and come within the
> subject matter of copyright as specified by sections 102 and 103, whether created
> before or after that date and whether published or unpublished, are governed
> exclusively by this title. Thereafter, no person is entitled to any such right or
> equivalent right in any such work under the common law or statutes of any State.

17 U.S.C. § 301(a).  The Fifth Circuit has established a two-part test to determine whether a state

law claim is preempted. "First, the work in which the right is asserted must come within the

*subject matter* of copyright as defined in sections 102." *Alcatel USA, Inc. v. DGI Techs.*, 166

F.3d 772, 785 (5th Cir. 1999).   Second, the cause of action must protect rights that are

"'equivalent' to any of the exclusive rights within the general scope of copyright as specified by

section 106." *Id.*; *Daboub*, 42 F.3d at 289 (citations omitted).

Unfair competition is not an independent tort.  *Rimkus Consulting Group, Inc. v.

Cammarata*, 688 F. Supp. 2d 598, 676 (S.D. Tex. 2010) (citing *Taylor Publ'g Co. v. Jostens,

Inc.*, 216 F.3d 465, 486 (5th Cir. 2000)).  "Under Texas law, 'unfair competition' is the umbrella

for all statutory and non-statutory causes of action arising out of business conduct that is contrary to honest practice in industrial or commercial matters." *Sefton v. Jew*, 201 F. Supp. 2d 730, 745 (N.D. Tex. 2001) (citing *Am. Heritage Life Ins. Co. v. Heritage Life Ins. Co.*, 494 F.2d 3, 14 (5th Cir. 1974)); *see also Taylor Publ'g Co.*, 216 F.3d at 486. "Within the broad scope of unfair competition are independent causes of action such as trade secret, 'palming off' or passing off, and misappropriation, to name only a few." *Kane v. Nace Int'l*, 117 F. Supp. 2d 592, 596 (S.D. Tex. 2000) (citing W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 130 at 1013-30 (5th ed. 1984)); *U.S. Sporting Prods., Inc. v. Johnny Stewart Game Calls, Inc.*, 865 S.W.2d 214, 218 (Tex. App.—Waco 1993, writ denied).

Courts have held that unfair competition claims premised on misappropriation of copyrighted material are preempted by federal copyright law. *See Alcatel*, 166 F.3d at 788 (finding unfair competition by misappropriation preempted); *M-I LLC v. Stelly*, 733 F. Supp. 2d 759, 791–92 (S.D. Tex. 2010) (same). However, causes of action that fall under the umbrella of unfair competition are not automatically preempted merely because copyrighted material may be at issue in the case. *See Kane*, 117 F. Supp. 2d at 596 (refusing to find unfair competition claims preempted because many of plaintiff's allegations did not implicate copyright law); *Spectrum Creations, L.P. v. Carolyn Kinder Intern.*, LLC, 514 F. Supp. 2d 934, 950 (W.D. Tex. 2007) (holding that unfair competition claim is not preempted where underlying tort that forms the basis of the claim is not preempted).

Although Plaintiff's complaint does not specifically explain that breach of fiduciary duty is the underlying cause of action that supports its allegations of unfair competition, this is the clear implication to be gleaned from the grouping of unfair competition with a breach of fiduciary duty claim. This Court could not find Texas cases that discuss breach of fiduciary duty

as falling under the general definition of unfair competition.  However, breach of fiduciary duty does fall under the general umbrella of "business conduct that is contrary to honest practice in industrial or commercial matters."  *See Am. Heritage*, 494 F.2d at 14; *cf. Kane*, 117 F. Supp. 2d at 597–98 (discussing Second Circuit case which recognizes unfair competition may be premised on breach of fiduciary duty); *Spectrum Creations*, 514 F. Supp. 2d at 949 (same).

Plaintiff's allegations of unfair competition through breach of fiduciary duty are not preempted by federal copyright law.  A number of the allegations that form the basis of Plaintiff's unfair competition claim have little to do with copyright law.  (*See* Doc. No. 2, Am. Compl. ¶ 40 (indicating that claim is based on alleged usurpation of corporate opportunities, removal of funds from Plaintiff's bank account, inducing Ross to breach his contract with Engenium).)  *See Kane*, 117 F. Supp. 2d at 596.  Furthermore, the Fifth Circuit has explicitly recognized that a breach of fiduciary duty claim involves an element that "render [the claim] different in kind from copyright infringement."  *Daboub*, 42 F.3d at 290–91; *see also M-I*, 733 F. Supp. 2d at 790; *Randolph*, 630 F. Supp. 2d at 750 ("However, if the plaintiff has alleged facts corresponding to an 'extra element,' such as a breach of fiduciary duty that would render his claims 'different in kind from a copyright infringement claim,' then his state law claims are not preempted.").

Defendants next argue that no facts in the record support a claim of unfair competition.  (Defs.' Mot. for Summ. J., at 20.)  However, Defendants' argument is premised on its misunderstanding of the difference between the general area of law referred to as unfair competition, and the specific causes of action subsumed within it.  *See U.S. Sporting Prods.*, 865 S.W.2d at 217.  The elements Defendants argue Plaintiff must meet to prove a claim of unfair competition are actually the elements of unfair competition by misappropriation, as evidenced by

the very case Defendants cite.  (*Id.* (citing *U.S. Sporting Prods.*, 865 S.W.2d at 218).); *see also Alcatel*, 166 F.3d at 788.  Indeed, as explained above, unfair competition is not an independent tort at all, and Defendants cannot request summary judgment on it.

### ii.   Breach of Fiduciary Duty

The elements of a breach of fiduciary duty claim are: (1) a fiduciary relationship between the plaintiff and defendant; (2) the defendant must have breached his fiduciary duty to the plaintiff; and (3) the defendant's breach must result in injury to the plaintiff or benefit to the defendant. *Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 283 (5th Cir. 2007) (citing *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App.—Dallas 2006, pet. denied)); *see also Lundy v. Masson*, 260 S.W.3d 482, 501 (Tex. App.—Houston [14th Dist.] 2008, pet. denied).  "In Texas, corporate officers and directors owe a strict fiduciary obligation to their corporation." *Floyd v. Heffner*, 556 F. Supp. 2d 617, 633 (S.D. Tex. 2008) (citing *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 576–77 (Tex. 1963); *Lifshutz v. Lifshutz*, 199 S.W.3d 9, 18–19 (Tex. App.—San Antonio, 2006)).  "While not uniformly defined by the case law, those fiduciary duties include not usurping corporate opportunities for personal gain, satisfying 'the extreme measure of candor, unselfishness, and good faith,' and dedication of his uncorrupted business judgment for the sole benefit of the corporation." *Id.* (quoting *Holloway*, 368 S.W.2d at 577). "More generally, the fiduciary status of corporate officers and directors give rise to three broad duties: the duty of due care, loyalty, and obedience." *Id.* (citing *Gearhart Indus., Inc. v. Smith Int'l, Inc.*, 741 F.2d 707, 719 (5th Cir. 1984)).

"The duty of loyalty dictates that a director must act in good faith and must not allow his personal interests to prevail over the interests of the corporation." *Gearhart*, 741 F.2d at 719. Whether a director is "interested" is a question of fact. *Id.* (citing *Holloway*, 368 S.W.2d at 576). A director is considered "interested" if he or she (1) makes a personal profit from a transaction

by dealing with the corporation or usurps a corporate opportunity; (2) buys or sells assets of the corporation; (3) transacts business in his director's capacity with a second corporation of which he is also a director or significantly financially associated; or (4) transacts business in his director's capacity with a family member. *Id.* at 719–20 (citations omitted). "When a corporate officer or director diverts a corporate opportunity to himself, he breaches his fiduciary duty of loyalty to the corporation." *Matter of Safety Int'l, Inc.*, 775 F.2d 660, 662 (5th Cir. 1985).

"To establish a breach of fiduciary duty by usurping a corporate opportunity, the corporation must prove that an officer or director misappropriated a business opportunity that properly belongs to the corporation." *Landon v. S & H Mktg. Group, Inc.*, 82 S.W.3d 666, 672 (Tex. App.—Eastland 2002, no pet.) (citing *Holloway*, 368 S.W.2d at 576–78; *Icom Sys., Inc. v. Davies*, 990 S.W.2d 408, 410 (Tex. App.—Texarkana 1999, no writ)). The business opportunity arises where a corporation has a legitimate interest or expectancy in, and the financial resources to take advantage of, a particular business opportunity. *Id.* (citing *Icom Sys.*, 990 S.W.2d at 410). A corporation's financial inability to take advantage of the corporate opportunity or abandonment of the business opportunity are defenses to a charge of usurpation of corporate opportunity. *Id.* (citing *Canion v. Tex. Cycle Supply, Inc.*, 537 S.W.2d 510, 513 (Tex. Civ. App.—Austin 1976, writ ref'd n.r.e.); *Huffington v. Upchurch*, 532 S.W.2d 576 (Tex. 1976)). "The burden of pleading and proving corporate abandonment and corporate inability is placed upon the officer or director who allegedly appropriated the corporate opportunity. *Id.* (citing *Huffington*, 532 S.W.2d at 579; *Canion*, 537 S.W.2d at 513).

Summary judgment is inappropriate on Plaintiff's claim of breach of fiduciary duty. Plaintiff presents evidence that, while Carr was still a director of Engenium, he negotiated with a prospective client, Kraton Ploymers. (*See* Aug. 10, 2010 – Aug. 17, 2010 Emails between Carr

and representative of Kraton Polymers.)   At this time, Carr has already formed Symphonic. (Doc. No. 150-11 Certificate of Formation.)   Shortly after his resignation from Engenium, Carr offered Kraton Ploymers a contract with Symphonic.   (*See* Aug. 20, 2010 Emails between Carr and representative of Kraton Polymers.)

Defendants may be correct that a director's duty of loyalty terminates upon resignation. *See Xerox Corp. v. Genmoora Corp.*, 888 F.2d 345, 353 (5th Cir. 1989) (recognizing general rule that fiduciary duty terminates when the director ends his relationship with the corporation). However, on this set of facts, a jury could conclude that Carr was negotiating with Kraton Ploymers on Symphonic's behalf all along, before his resignation.  *See* 3A Fletcher's Cyclopedia of the Law of Private Corporations, § 1082 ("[D]irectors can be liable for damages occurring after leaving office where their breach of duty while in office contributed to the loss."). Accordingly, whether Carr's negotiation with Kraton Ploymers, which appeared all but finalized by August 17, 2010 (*see* Aug. 10, 2010 – Aug. 17, 2010 Emails between Carr and representative of Kraton Polymers), violated his duty of loyalty and diverted corporate opportunities from Engenium to himself is a fact issue.

The cases Defendants cite in support of their motion for summary judgment are unavailing.  (Defs.' Mot. for Summ. J., at 21–23.)  In *Rankin v. Naftalis*, 557 S.W.2d 940 (Tex. 1977), the Texas Supreme Court held, that while the relationship between joint venturers in an oil and gas venture had a fiduciary character, it extended only to the development of a particular lease that formed the basis of their venture.  557 S.W.2d at 944.  *Rankin* says nothing of the long-recognized duty of a corporate director not to usurp corporate opportunities.  *See Gearhart*, 741 F.2d at 719; *Holloway*, 368 S.W.2d at 576–78.  In *Warrantech Corp. v. Computer Adapters Servs., Inc.*, 134 S.W.3d 516 (Tex. App.—Fort Worth 2004, no pet.), a Texas Court of Appeals

upheld a jury's finding that defendants did not breach a fiduciary duty because no legal authority was provided "for the proposition that an employee must inform his employer that he is considering starting a business that will *not* compete with the employer."  134 S.W.3d at 531 (emphasis added).  There, defendants had started a company that did business with plaintiffs, not a business that competed against plaintiffs.  *Id.*

Defendants' Motion for Summary Judgment is **DENIED** with respect to Plaintiff's claim of breach of fiduciary duty.

### D.  Misappropriation of Trade Secrets

Defendants move for summary judgment on Plaintiff's misappropriation of trade secrets claim.  (Defs.' Mot. for umm. J., at 24 –26.)  Under Texas law, the elements of misappropriation of trade secrets are: (1) a trade secret existed; (2) the trade secret was acquired through a breach of a confidential relationship or discovered by improper means; (3) the defendant used the trade secret without authorization from the plaintiff; and (4) resulting damages.  *Calce v. Dorado Exploration, Inc.*, 309 S.W.3d 719, 742 (Tex. App.—Dallas 2010, no pet.) (citing *Tex. Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348, 366–67 (Tex. App.—Dallas 2009, pet. denied); *SP Midtown, Ltd. v. Urban Storage, L.P.*, No. 14–07–00717–CV, 2008 WL 1991747, at *4 (Tex. App.—Houston [14th Dist.] May 8, 2008, pet. denied) (mem. op.)).

A trade secret is "any formula, pattern, device or compilation of information which is used in one's business, and which gives one an opportunity to obtain an advantage over competitors who do not know or use it."  *T–N–T Motorsports, Inc. v. Hennessey Motorsports, Inc.*, 965 S.W.2d 18, 22 (Tex. App.—Houston [1st Dist.] 1998, pet. dism'd) (citing *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex. 1996); *Rugen v. Interactive Bus. Sys., Inc.*, 864 S.W.2d 548, 551 (Tex. App.—Dallas 1993, no writ)).  To determine whether

information constitutes a trade secret, a court should apply the following six factors:  (1) the extent to which the information is known outside the claimant's business;  (2) the extent to which the information is known by employees and others involved in the claimant's business; (3) the extent of the measures taken by the claimant to guard the secrecy of the information; (4) the value of the information to the claimant and to its competitors; (5) the amount of effort or money expended by the claimant in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.  *In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003).  However, the party claiming a trade secret is not required to satisfy all six factors "because trade secrets do not fit neatly into each factor every time."  *Id.* at 740.

It is not entirely clear whether Plaintiff contends that *Scheduling Workbench*'s code or the information Engenium possessed about Kraton Ploymers' specific client needs is the trade secret at issue.  (*See* Pl.'s Resp., at 19–20.)  *Cf. Trilogy Software, Inc. v. Callidus Software, Inc.*, 143 S.W.3d 452, 466 n.11 (Tex. App.—Austin 2004, pet. denied) (suggesting that source code may constitute a trade secret); *T–N–T Motorsports*, 965 S.W.2d at 22 (noting that "items such as customer lists, pricing information, client information, customer preferences, buyer contacts, market strategies, blueprints, and drawings" may all be trade secrets).  This Court need not decide at this stage whether any of the information identified by Plaintiff constitutes a trade secret, because Defendants do not argue to the contrary.  (*See* Defs.' Mot. for Summ. J., at 24 – 26 (setting out factors for what constitutes a trade secret, but not challenging existence of a trade secret).)  Rather, Defendants argue they are entitled to summary judgment on this claim because (1) Plaintiff has no evidence that Defendant actually used Engenium's trade secrets, and (2) Plaintiff cannot show a causal link between the injury suffered by Plaintiff and Defendants'

alleged use of Engenium's trade secrets.  (Defs.' Mot. for Summ. J., at 24–26.)  Defendants' contentions are not supported by the record.

"Use of the trade secret means commercial use by which the offending party seeks to profit from the use of the secret.  *Global Water Group, Inc. v. Atchley*, 244 S.W.3d 924, 928 (Tex. App.—Dallas 2008, pet. denied) (citing *Metallurgical Indus. Inc. v. Fourtek, Inc.*, 790 F.2d 1195, 1205 (5th Cir. 1986); *Atl. Richfield Co. v. Misty Prods., Inc.*, 820 S.W.2d 414, 422 (Tex. App.—Houston [14 Dist.] 1991, writ denied)).  "Evidence of a similar product may give rise to an inference of actual use under certain circumstances."  *Id.* (citing *Leggett & Platt, Inc. v. Hickory Springs Mfg. Co.*, 285 F.3d 1353, 1361 (Fed. Cir. 2002)).  Here, as explained in detail *supra* Part III.B.ii.2, *Harmonix* contains many similarities to *Scheduling Workbench*.  A jury could infer from these similarities that Defendants used Engenium's trade secrets to develop their own competitor product.  This is especially true in light of how quickly portions of *Harmonix* were developed after Carr's resignation.  (*See, e.g.*, Muppavarapu Report, at 17.) Defendants' assertions that Carr "used his own knowledge and design capability" to develop *Harmonix* (*see* Defs.' Mot. for Summ. J., at 26) do not demonstrate the absence of any genuine issue of material fact.  *See Liquid Air Corp.*, 37 F.3d at 1075.  Similarly, a genuine issue of material fact exists as to whether Engenium would have retained Kraton Ploymers as a client but for Defendants' alleged misappropriation of source code and client information.

The case cited by Defendants in support of their motion is easily distinguishable. (*See* Defs.' Mot. for Summ. J., at 26 (citing *Propulsion Techs., Inc. v. Attwood Corp.*, 369 F.3d 896, 905 (5th Cir. 2004).)  There, Plaintiff presented no evidence of use of trade secrets beyond indicating that his experience working for plaintiff enabled him to learn how to develop propellers.  *Propulsion*, 369 F.3d at 905.  Furthermore, Defendants pointed out notable

56

differences between plaintiff's and defendants' design. *Id.* Furthermore, the court found insufficient evidence to support a damages award because there was simply no indication that defendants' profits came from using plaintiff's trade secrets. *Id.* Here, substantially similarity exists between Plaintiff's and Defendants' products, portions of Defendants' product were developed very quickly after Carr resigned, and Carr negotiated a contract between a prospective Engenium client and Symphonic at around the same time as his resignation.

Defendants' Motion for Summary Judgment is **DENIED** with respect to Plaintiff's claim of misappropriation of trade secrets.

### E. Conversion

Defendants seek summary judgment on Plaintiff's conversion claim. (Defs.' Mot. for Summ. J., at 27–29.) Specifically, they argue that (1) the money at issue is not specific chattel, and (2) in any event, Carr had a superior right to possess the money because he had never been compensated for the work he performed for Engenium. (*Id.* at 28–29.) Plaintiff contends that the sum removed was half of ConocoPhillips' support payment fees for the upcoming year, and Carr had no right unilaterally to remove any portion of the payment. (Pl.'s Resp., at 20–21.)

"Conversion is the unauthorized and wrongful assumption and exercise of dominion and control over the personal property of another to the exclusion of, or inconsistent with, the owner's rights." *Smith v. Maximum Racing, Inc.*, 136 S.W.3d 337, 341 (Tex. App.—Austin 2004, no pet.) (citing *Waisath v. Lack's Stores, Inc.*, 474 S.W.2d 444, 447 (Tex. 1971)). To establish a claim for conversion of personal property, a plaintiff must prove that: (1) the plaintiff owned or had legal possession of the property or entitlement to possession; (2) the defendant unlawfully and without authorization assumed and exercised dominion and control over the property, to the exclusion of, or inconsistent with, the plaintiff's rights as an owner; (3) the plaintiff demanded return of the property; and (4) the defendant refused to return the property.

*Id.* (citing *Apple Imports, Inc. v. Koole*, 945 S.W.2d 895, 899 (Tex. App.—Austin 1997, writ denied); *Whitaker v. Bank of El Paso*, 850 S.W.2d 757, 760 (Tex. App.—El Paso 1993, no writ)); *see also M-I*, 733 F. Supp. 2d at 792 (citing *City Bank v. Compass Bank*, 717 F. Supp. 2d 599, 611–12, 2010 WL 1959808, at *10 (W.D. Tex. May 12, 2010)).

"Money is subject to conversion only when it can be identified as a specific chattel, and not where an indebtedness may be discharged by the payment of money generally." *Newsome v. Charter Bank Colonial*, 940 S.W.2d 157, 161–64 (Tex. App.—Houston [14th Dist.] 1996, writ denied) (citing *Estate of Townes v. Townes*, 867 S.W.2d 414, 419 (Tex. App.—Houston [14th Dist.] 1993, writ denied)); *see also Mitchell Energy Corp. v. Samson Res. Co.*, 80 F.3d 976, 984 (5th Cir. 1996) (providing as example of specific chattel an old coin). "[A]n action will lie for conversion of money when its identification is possible and there is an obligation to deliver the specific money in question or otherwise particularly treat specific money." *Hernandez v. Sovereign Cherokee Nation Tejas*, 343 S.W.3d 162, 175 (Tex. App.—Dallas 2011, pet. denied) (citing *Houston Nat'l Bank v. Biber*, 613 S.W.2d 771, 774 (Tex. Civ. App.—Houston [14th Dist.] 1981, writ ref'd n.r.e.)). Generally, in Texas, actions for conversion of money are available only where "money is (1) delivered for safekeeping; (2) intended to be kept segregated; (3) substantially in the form in which it is received or an intact fund; and (4) not the subject of a title claim by the keeper." *In re TXNB Internal Case*, 483 F.3d 292, 308 (5th Cir. 2007) (citing *Edlund v. Bounds*, 842 S.W.2d 719, 727 (Tex. App.—Dallas 1992, writ denied)).

Here, Plaintiff alleges that Carr is liable for conversion of funds he removed from Engenium's account. (Pl.'s Resp., at 20–21.) Engenium contends the funds removed were half of the support payment from ConocoPhillips for the upcoming year. (*Id.* at 21; Engenium's Checking Account History; *compare* July 19, 2009 Invoice *with* May 10, 2010 Invoice.) Carr

admits removing $64,687.50 from Engenium's bank account, but contends he removed the funds as "payment for services rendered."  (Defs.' Mot. for Summ. J., at 28 (citing Doc. No. 138-5, Carr Decl. ¶ 15).)

This factual disagreement does not create a genuine issue of material preventing summary judgment because the funds at issue are not the proper subject of a conversion claim. This case does not involve specific funds that are delivered for safekeeping, nor is there any obligation to deliver or otherwise treat the money in a particular way.  *See Hernandez*, 343 S.W.3d at 175 (finding conversion a proper remedy where Hernandez promised investors that "funds would be deposited into his IOLTA account, and he would hold the funds in trust for SCNT for the use and benefit of the SCNT) (quotations omitted)); *Dixon v. State*, 808 S.W.2d 721, 723–24 (5th Cir. 1991) (conversion appropriate where officer of a corporation spent corporation's money set aside for state taxes, because statute provides "that money that is received or collected as a tax or which is represented to be a tax is held by the collecting party in trust for the benefit of the state").  This case more closely resembles situations where unspecific sums of money are improperly removed or withheld. *See Compass Bank v. Villareal*, No. L–10–8, 2011 WL 1740270, at *8, 11 (S.D. Tex. May 5, 2011) (holding that conversion is an inappropriate remedy where defendant, a bank employee, effected unauthorized debits from customers accounts and deposited funds to businesses owned and controlled by her associates because "[t]he Bank can be compensated for Defendants' acquisition of its funds through the payment of money generally"); *Rente Co. v. Truckers Express, Inc.*, 116 S.W.3d 326, 333 (Tex. App.—Houston [14th dist.] 2003, no pet.) (conversion not appropriate where defendant stopped paying rent for equipment obtained from plaintiff).

Because the money Carr admittedly removed from Engenium's account is not the proper subject of a conversion action, Defendants' Motion for Summary Judgment as to Plaintiff's conversion claim is **GRANTED**.

### F. Tortious Interference with a Contract

Defendants also argue they are entitled to summary judgment on Plaintiff's claim of tortuous interference with contract.  (Defs.' Mot. for Summ. J., at 29–30.)  Specifically, they argue that Plaintiff presents no evidence that (1) Carr interfered with the contract Ross had with Engenium, and (2) such alleged interference proximately caused the breach.  (*Id.*)  Plaintiff responds that (1) whether Carr's interference was willful is a question of fact reserved for the jury, and (2) Defendants have not presented any evidence that establishes their defense.

A plaintiff must establish the following elements to succeed on a tortious interference with contract claim: (1) the existence of a contract subject to interference, (2) willful and intentional interference, (3) that proximately causes damage, and (4) actual damage or loss. *Specialties of Mex. Inc. v. Masterfoods USA*, No. L–09–88, 2010 WL 2488031, at *9 (S.D. Tex. June 14, 2010) (citing *All Am. Tel., Inc. v. USLD Commc'ns, Inc.*, 291 S.W.3d 518, 531 (Tex. App.—Fort Worth 2009, pet. denied)); *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 207 (Tex. 2002).  "To show tortious interference, a plaintiff is not required to prove intent to injure, but rather 'only that the actor desires to cause the consequences of his act, or that he believes that the consequences are substantially certain to result from it.'"  *Amigo Broad., LP v. Spanish Broad. Sys., Inc.*, 521 F.3d 472, 489 (5th Cir. 2008) (citing *Sw. Bell Tel. Co. v. John Carlo Tex., Inc.*, 843 S.W.2d 470, 472 (Tex. 1992)).  "To show proximate cause, a plaintiff must allege that the defendant took an active part in persuading a party to a contract to breach it."  *M-I*, 733 F. Supp. 2d at 775 (citing *Hambric Sports Mgmt., LLC v. Team AK, Inc.*, No. 3:09–CV–1662–L, 2010 WL 2605243, at *9 (N.D. Tex. June 29, 2010)); *Amigo*, 521 F.3d at 489.  "Merely entering

into a contract with a party with the knowledge of that party's contractual obligations to someone else is not the same as inducing a breach." *M-I*, 733 F. Supp. 2d at 775 (citing *Hambric*, WL 2605243, at *9). "It is necessary that there be some act of interference or of persuading a party to breach, for example by offering better terms or other incentives, for tort liability to arise." *Id.* (citing *Hambric*, WL 2605243, at *9).

The Court agrees with Defendants that Plaintiff has produced no evidence to support a claim of tortuous interference with Ross' contract with Engenium.  Although Plaintiff has produced a contract between Ross and Engenium which provides that Ross agreed to, among other things, abstain from infringing on Engenium's intellectual property rights, Plaintiff does not point to any evidence suggesting that Carr encouraged Ross to violate this, or any other, provision of the contract.  (*See* Pl.'s Resp., at 22; Doc. No. 150-14, Master Contractor Agreement ("MCA"), at 4.)  Plaintiff does no more than baldly assert that Carr "induced Ross to breach the MCA and work for Symphonic."  (*Id.*)  However, Plaintiff does not point out any statements or steps taken by Carr that might constitute interference that proximately causes breach.  The only potential act of interference that Plaintiffs identify is Carr's offer to work at Symphonic.  (*Id.*)  It is well-established that merely entering into a contract with a party with the knowledge that the party has other contractual obligations does not satisfy the proximate cause element.  *Amigo*, 521 F.3d at 489; *M-I*, 733 F. Supp. 2d at 775 (citing *Hambric*, WL 2605243, at *9).  Plaintiffs point to no evidence of any act by Carr that proximately caused Ross to breach his contract with Engenium.

Plaintiff's argument that intent is generally a question for the jury is irrelevant.  .  (*See* Pl.'s Resp., at 22.)  Contrary to Plaintiff's characterization, Defendants do not argue only that Plaintiff cannot prove intent.  (*Id.*)   Rather, as explained above, Defendants argue that Plaintiff

has produced no evidence of any interference, intentional or otherwise, and that Plaintiff has produced no evidence that such alleged interference proximately caused the breach. The Court agrees that the only evidence of "interference" produced by Plaintiff is Carr's offer of a position with Symphonic, which, as a matter of law, is insufficient to meet the proximate cause requirement of tortuous interference with a contract.  Plaintiff's argument that Defendants have not offered facts that would prove Carr's defense is similarly unavailing.  Defendants are not obliged to "prove that the summary judgment facts establish defense" to prevail on a motion for summary judgment.  (*Id.*)  Defendants may meet their burden by showing that Plaintiff "fail[ed] to make a showing sufficient to establish the existence of an element essential to that [its] case" since "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Liquid Air Corp.*, 37 F.3d at 1075 (recognizing that movant need not negate the elements of the nonmovant's case to prevail on a motion for summary judgment).

Defendants' Motion for Summary Judgment as to Plaintiff's tortious interference with contract claim is **GRANTED**.

## IV.    CONCLUSION

For the reasons discussed above, the Court finds that

- Plaintiff's Motion to Strike Wright (Doc. No. 147) must be **GRANTED**;

- Plaintiff's Motion to Strike Faiola (Doc. No. 148) must be **GRANTED**;

- Defendants' Motion to Exclude Muppavarapu (Doc. No. 136) must be **DENIED**;

- Defendants' Motion to Exclude Johnson (Doc. No. 137) must be **DENIED**;

- Plaintiff's Partial Motion for Summary Judgment (Doc. No. 134) must be **GRANTED**; and

- Defendants' Motion for Summary Judgment (Doc. No. 138) must be **GRANTED IN PART AND DENIED IN PART**.  Specifically, Defendants' Motion for Summary Judgment must be **DENIED** as to Plaintiff's claims of copyright infringement, unfair competition/breach of fiduciary duty, and misappropriation of trade secrets, and **GRANTED** as to Plaintiff's claims of conversion and tortious interference with contract.

A hearing is set for March 6, 2013 at 1:30 p.m.  Parties should confer before the hearing and determine whether they wish to proceed to a jury trial on the remaining issues.  Parties should also be prepared to address the permanent injunction at the hearing.

**IT IS SO ORDERED**.

**SIGNED** at Houston, Texas, on this the 15th day of February, 2013.

_____

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE